PER CURIAM.
The United States District Court for the Northern District of Alabama, Southern Division (“the federal district court”), has certified to this Court the following question pursuant to Rule 18, Ala. R.App. P.:
“Under Alabama law, is a ‘Potentially Responsible Party’ (‘PRP’) letter from the Environmental Protection Agency (‘EPA’), in accordance with the Comprehensive Environmental Response Compensation and Liability Act (‘CERCLA’) provisions, sufficient to satisfy the ‘suit’ requirement under a liability policy of insurance?”
We answer this question in the affirmative.

I. Facts and Procedural History

The plaintiff in the underlying action is Alabama Gas Corporation (“Alagasco”). Defendants St. Paul Fire and Marine Insurance Company, St. Paul Surplus Lines Insurance Company, and St. Paul Mercury Insurance Company are all direct and indirect subsidiaries of defendant Travelers Casualty and Surety Company. The defendants (hereinafter sometimes collectively referred to as “Travelers”) are the providers or the predecessor to the providers of Alagaseo’s Comprehensive General Liability (“CGL”) insurance policies from the late 1940s until the early 1980s.
In its certification to this Court, the federal district court provided the following pertinent background information:
“St. Paul Fire policy .... provides that [Travelers] must:
“ ‘(a) Defend in the name and on behalf of the insured any suit against the insured alleging such injury, death, damage, or destruction and seeking damages on account thereof, even if such suit is groundless, false, or fraudulent; but [Travelers] shall have the right to make such investigation, negotiation and settlement of any claim or suit as may be deemed expedient by [Travelers].’ (emphasis added).
“Said policy applies only to ‘occurrences’ that occur during the policy period. The term ‘occurrence’ is defined in the policy to include ‘a continuous or repeated exposure during the policy period to conditions which unexpectedly and unintentionally cause ... injury to or destruction of tangible property, including the loss of use thereof.’[1]
“From sometime in the latter half of the 19th Century until approximately 1946, gas for lighting, cooking, heating and other purposes was supplied to the customers in Huntsville, Alabama by a manufactured gas plant located near the intersection of Holmes Avenue and Dal *697 las Avenue (the ‘Huntsville MGP’). The basic operation of the Huntsville MGP involved the superheating of coal or a combination of coke and oil in low oxygen chambers to produce gas that was then purified and fed through a gas distribution system to the citizens of Huntsville.
“In 1918 the Huntsville Gas Company was incorporated and acquired an interest in the Huntsville MGP. Alagaseo is a corporate successor to the Huntsville Gas Company. In or around 1946, Ala-gasco converted the Huntsville MGP from a gas manufacturing process to a propane air system, although on information and belief, at least some of the former gas manufacturing fixtures and facilities remained in place. Alagaseo sold the Huntsville MGP and the citywide distribution system to the City of Huntsville in 1949.
“The City of Huntsville operated the Huntsville MGP as a propane air operation until March 1952, when a natural gas pipeline reached that part of Alabama and the City converted to natural gas. The City of Huntsville continued to use the site for various purposes ancillary to its utility services until approximately 1967.
“In November 1967 the City of Huntsville conveyed the former Huntsville MGP site to an entity cooperating with the federal Department of Housing and Urban Development (‘HUD’) and the Huntsville Housing Authority. Between November 1967 and May 1970, entities working in cooperation with HUD and the Housing Authority demolished the remains of the former Huntsville MGP and, between May 1970 and April 1971, built the Searcy Homes public housing project on that site. Title to Searcy Homes passed to the Housing Authority in 1971.
“In June 1998 the parent company to [Alagaseo], Energen, alerted defendants that there were actual or potential claims arising from historical manufactured gas plant (‘MGP’) operations. This notification included the Huntsville MGP.
“Subsequently, Energen, as the ‘Policyholder,’ and St. Paul Fire and Marine Insurance Company, as the ‘Insurer,’ entered into a ‘Confidentiality Agreement for Settlement Negotiations’ (the ‘Agreement’) in February 1999. This Agreement states that Energen ‘has received or expects to receive one or more claims and/or lawsuits with respect to alleged environmental contamination.’ The second ‘WHEREAS’ clause states that ‘Policyholder asserts that losses associated with the Claims and potential Claims are covered under certain insurance policies issued to Policyholder or its predecessors by various insurers, including St. Paul Fire & Marine Insurance Company.’ The third and final ‘WHEREAS’ clause states that ‘Policyholder and Insurer wish to enter into good faith negotiations toward the possible resolution of claims.’ The Agreement further states that ‘[t]he sole and exclusive remedy of any party hereto for any alleged failure to negotiate in good faith to resolve issues during the Negotiation Period shall be cancellation of this Agreement.’ The Agreement defines ‘Negotiation Period’ as ‘extending from the date of execution of this Agreement until this Agreement is terminated by either party.’ Termination of the Agreement requires twenty-four hours written notice to the other party’s signatory. Neither Energen nor [Travelers] has ever canceled the Agreement.
“Plaintiff alleges the operations of the Huntsville MGP left behind what is considered hazardous substances under federal and state environmental laws. On *698 October 8, 2008, plaintiff received an ‘information request’ regarding the Huntsville MGP site from the Environmental Protection Agency (‘EPA’) under the authority of section 104(e) of the Comprehensive Environmental Response, Compensation and Liability Act. Plaintiff also received a Pollution Report which stated:
“ ‘EPA’s Enforcement Section is preparing an assessment of liability and ability to pay on Potential Responsible Parties (PRPs) related to the site. If it is determined that one or more PRPs are able to complete a removal action, [the agency] may pursue an Administrative Order on Consent (AOC) with them to carry out the time-critical removal action and provide reimbursement for past costs.’ “On October 29, 2008, Alagasco for-
warded the Information Request and Pollution Report to the defendants and stated that they may constitute a claim under defendants’ policies. Alagasco additionally tendered the defense and made a demand for coverage. On November 10, 2008, defendants responded stating their belief that the EPA’s assertions did not rise to the level of a ‘formal claim’ and therefore defendants were unable to state a coverage position until ‘such a claim or lawsuit is received.’
“From October 2008 to June 2009, plaintiff and the EPA held talks regarding the site and the fact that plaintiff was the lead PRP. Plaintiff continued to update defendants on the communications with the EPA as well as demand a defense. On June 24, 2009, plaintiff received a formal Notice of Potential Liability and Offer to Negotiate from the EPA (the ‘PRP Letter’) and a draft AOC. Plaintiff forwarded the PRP Letter to defendants and again reiterated a demand for defense. Defendants twice responded saying [they were] still reviewing the file and plaintiff should act in what it believed was plaintiffs best interests. On February 3, 2010, defendants notified plaintiff that [they] did not believe any of the communications from the EPA constituted a ‘suit’ such that [they] did not believe [they] had ‘any potential defense obligations at the time.’ ”
(Citations omitted.)
On July 9, 2010, Alagasco filed in the federal district court a complaint against Travelers seeking a declaration of the rights and obligations of the parties under the CGL policies issued to Alagasco. The complaint contained allegations of breach of contract, bad faith, and waiver and es-toppel, and, in addition to seeking declaratory relief, sought monetary damages and defense costs.
Alagasco filed a motion for a partial summary judgment in the federal district court action, arguing that Travelers had a duty to defend Alagasco against the charge made by the United States Environmental Protection Agency (“the EPA”) that it is a “Potentially Responsible Party” (“PRP”). In response, Travelers filed a cross-motion for a summary judgment, arguing that it had no duty to defend Alagasco because the EPA’s PRP letter did not constitute a “suit” under the CGL policies.
Because neither the courts of this State nor any federal court applying Alabama law has ever addressed the issue whether a PRP letter from the EPA satisfies the “suit” requirement under a liability policy of insurance, and because the issue is potentially dispositive of claims in the action, the federal district court has propounded to this Court the certified question quoted at the outset of this opinion.

II. Discussion and Analysis

Before we address the question certified by the federal district court, we note that *699 Travelers has filed a motion to strike substantial portions of Alagasco’s brief because Alagasco has requested that this Court answer a second question not asked by the federal district court. That question is:
“Whether an insurer can always claim to have a reasonably legitimate or arguable reason within the test for normal bad faith when it refuses to provide a defense under a liability policy based on a position not previously addressed by Alabama courts, even if that position is contrary to the clear and substantial majority rule outside Alabama and even if the insurer fails to offer to defend under a reservation of rights?”
As Travelers observes in its motion to strike, certified questions are proposed under Rule 18, Ala. R.App. P., which provides:
‘When it shall appear to a court of the United States that there are involved in any proceeding before it questions or propositions of law of this State which are determinative of said cause and that there are no clear controlling precedents in the decisions of the Supreme Court of this State, such federal court may certify such questions or propositions of law of this State to the Supreme Court of Alabama for instructions concerning such questions or propositions of state law, which certified question the Supreme Court of this State, by written opinion, may answer.”
(Emphasis added.) Rule 18(c) provides that “[t]he provisions of this rule may be invoked by any of the federal courts upon its own motion or upon the suggestion or motion of any interested party when approved by such federal court.” Thus, a certified question is, by definition, one that is propounded and certified to this Court by a federal court.
The only question propounded and certified to this Court by the federal district court in this case is the one stated at the outset of this opinion. The additional question posed by Alagasco has not been properly submitted to this Court, and we will not address it. Travelers’ motion to strike the portions of Alagasco’s brief discussing Alagasco’s proposed certified question is well taken and it is granted.
Turning then to the one question that has been propounded by the federal district court, we begin by observing certain fundamental principles regarding the construction of contracts of insurance in this State:
“ ‘When analyzing an insurance policy, a court gives words used in the policy their common, everyday meaning and interprets them as a reasonable person in the insured’s position would have understood them. Western World Ins. Co. v. City of Tuscumbia, 612 So.2d 1159 (Ala.1992); St. Paul Fire & Marine Ins. Co. v. Edge Mem’l Hosp., 584 So.2d 1316 (Ala.1991). If, under this standard, they are reasonably certain in their meaning, they are not ambiguous as a matter of law and the rule of construction in favor of the insured does not apply. Bituminous Cas. Corp. v. Harris, 372 So.2d 342 (Ala.Civ.App.1979). Only in cases of genuine ambiguity or inconsistency is it proper to resort to rules of construction. Canal Ins. Co. v. Old Republic Ins. Co., 718 So.2d 8 (Ala.1998). A policy is not made ambiguous by the fact that the parties interpret the policy differently or disagree as to the meaning of a written provision in a contract. Watkins v. United States Fid. & Guar. Co., 656 So.2d 337 (Ala.1994). A court must not rewrite a policy so as to include or exclude coverage that was not intended. Up *700 ton v. Mississippi Valley Title Ins. Co., 469 So.2d 548 (Ala.1985).’
“B.D.B. v. State Farm Mut. Auto. Ins. Co., 814 So.2d 877, 879-80 (Ala.Civ.App.2001). However, if a provision in an insurance policy is found to be genuinely ambiguous, ‘policies of insurance should be construed liberally in respect to persons insured and strictly with respect to the insurer.’ Crossett v. St. Louis Fire & Marine Ins. Co., 289 Ala. 598, 603, 269 So.2d 869, 873 (1972).”
State Farm Mut. Auto. Ins. Co. v. Brown, 26 So.3d 1167, 1169-70 (Ala.2009) (emphasis added).
The word that is the focus of the federal district court’s question — “suit”—is not defined in the policies before us. Consistent with the above-stated principles, this Court also has held:
“If a word or phrase is not defined in [an insurance] policy, then the court should construe the word or phrase according to the meaning a person of ordinary intelligence would reasonably give it. The court should not define words it is construing based on technical or legal terms.”
Safeway Ins. Co. of Alabama, Inc. v. Herrera, 912 So.2d 1140, 1143 (Ala.2005) (citations omitted).
Accordingly, it is incumbent upon us to construe the term “suit” according to the meaning a person of ordinary intelligence reasonably would afford it in regard to the insurance contract at issue and the statutory and regulatory scheme that exists for the enforcement of applicable environmental laws, including the imposition of liability under those laws. In this regard, it is helpful to understand the history and nature of that scheme.
“In litigation over what constitutes a ‘suit’ triggering the insurer’s duty to defend environmental liability claims against the insured, the issue must be evaluated in light of the nature of environmental enforcement actions initiated by governmental regulatory agencies. Courts have indicated that prior to the passage of pollution control laws, which began in the late 1960s, there was no dispute over the meaning of the term ‘suit’ as used in CGL insurance policies. It was generally understood that a ‘suit’ was initiated with the traditional summons and complaint. However, as regulatory agencies commenced administrative actions against insureds to enforce environmental laws, and insureds demanded that insurers defend them against such actions pursuant to their insurance policies, the issue then arose as to whether such administrative actions constituted ‘suits’ under the terms of the policy. Most of the duty to defend insurance disputes have taken shape in the context of an insured’s potential environmental liability under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA) or parallel state hazardous waste cleanup law, which imposes strict liability on companies and individuals who contributed to the environmental contamination of a given site.
“In 1980, Congress enacted CERCLA, commonly known as ‘Superfund,’ to facilitate remedial action whenever there is a release — or threatened release — of hazardous substances into the environment, and to hold responsible parties liable for any cleanup and response costs. Several broad classes of potentially responsible parties (PRPs) may be held liable for a release of hazardous substances at a given site: (1) present owners and operators of the site; (2) past owners and operators of the site; (3) generators of hazardous substances who arranged for disposal of hazardous substances at the site; and (4) transporters of hazardous *701 substances to the site. After the U.S. Environmental Protection Agency (EPA) identifies PRPs associated with a given site, it is empowered to issue administrative orders compelling the PRPs to perform the cleanup, or the agency can perform its own cleanup and then bring an action against the PRPs to recover the cleanup costs.”
Mark S. Dennison, Annotation, What Constitutes “Suit" Triggering Insurer’s Duty to Defend Environmental Claims — State Cases, 48 A.L.R.5th 355, 365-66 (1997) (footnotes omitted).
“The CERCLA statutory scheme gives the EPA several legal methods for compelling PRPs to assume responsibility for hazardous waste cleanup. Initially, CERCLA empowers the EPA to ‘respond’ to the actual or threatened release of hazardous substances into the environment. See Section 9604, Title 42, U.S.Code. The Act then shifts liability for ‘response costs’ [defined in 42 U.S.C. § 9601(23) through 9601(25) ] to responsible parties, namely, owners and operators of hazardous waste facilities, waste generators, disposers, and transporters. See Section 9607, Title 42, U.S.Code.
“The enforcement process includes two primary methods of shifting cleanup responsibility to PRPs: (1) The CERC-LA statutory scheme provides for in-junctive relief by permitting the EPA to issue an administrative order compelling cleanup or to obtain a court order compelling the same; and (2) CERCLA also allows for restitutional relief by authorizing the EPA to expend funds from the federal Superfund to clean up toxic waste sites and subsequently institute cost recovery actions against responsible parties.
“1. Compelled, Cleanup Actions: Initially, the EPA encourages voluntary participation in the cleanup efforts through the issuance of a ‘PRP notification,’ discussed infra. If the PRP does not respond to this invitation, CERCLA Section 106(a) authorizes the EPA to issue an administrative order to compel a responsible party to clean up a site. The EPA usually first attempts to negotiate the administrative order with the PRP. If the EPA chooses to negotiate and is successful, the agreement is bound in a consent order. However, if negotiations fail, the EPA may unilaterally develop the administrative order. The issuance of this order tends to accelerate participation, as a failure to comply could subject the PRP to a fine of $25,000 ‘for each day in which such violation occurs or such failure to comply continues.’ Section 9606(b)(1), Title 42, U.S.Code.
“Section 106(a) also authorizes the EPA to seek an injunctive order. The EPA, through the Department of Justice, may file in federal district court to compel PRP cleanup under CERCLA.
“Whether the remedy sought by the EPA is administrative or judicial, the purpose of enforcement actions taken pursuant to CERCLA Section 106(a) is to get the PRPs to take the lead in site cleanup operations.
“2. Cost Recovery Actions: The EPA may decide to clean up first and ask questions later. In other words, if the PRP chooses not to participate in the cleanup operations (or simply fails to respond to the PRP notifications), CERCLA empowers the federal government to use Superfund money to clean up a site and seek reimbursement later from any responsible party it can locate. See Sections 9604(a)(1) and 9607(a), Title 42, U.S.Code. If, during the process of cleanup, the EPA issued an ‘information-gathering’ administrative order un *702 der CERCLA Section 104(e), the failure of a PRP to abide could subject the party to treble damages. See Section 9607(c)(3), Title 42, U.S.Code.”
Professional Rental, Inc. v. Shelby Ins. Co., 75 Ohio App.3d 365, 372-74, 599 N.E.2d 423, 428-29 (1991)(emphasis omitted).
Although this Court has not had occasion to address whether a PRP letter issued by the EPA constitutes a “suit” for purposes of a CGL policy, a significant number of supreme courts in other states have addressed the issue. Most of these courts have determined that a PRP letter does in fact constitute a “suit” for purposes of a CGL policy.[2] In this regard, we find helpful and persuasive the analysis provided by the Supreme Court of Michigan in Michigan Millers Mutual Insurance Co. v. Bronson Plating Co., 445 Mich. 558, 519 N.W.2d 864 (1994):
“There is a division of opinion, both within Michigan and among other jurisdictions, regarding the definition of the term ‘suit,’ and its application to nontraditional legal proceedings.[8] Some courts have found that ‘suit’ must refer unambiguously to a court proceeding initiated by a complaint, while others hold that the term may also encompass some nonjudicial proceedings.
*703 “In determining what a typical layperson would understand a particular term to mean, it is customary to turn to dictionary definitions. Having canvassed a number of lay dictionaries, we note that most definitions of ‘suit’ do include a reference to some type of court proceeding, e.g., ‘the act, the process, or an instance of suing in a court of law.’ The Random House Dictionary of the English Language (1987). Nevertheless, ‘suit’ is not defined exclusively in those terms. For instance, Webster’s New World Dictionary of the American Language (2nd college ed., 1982), provides the alternative definition, ‘attempt to recover a right or claim through legal action,’ while Webster’s Third New International Dictionary of the English Language (1964), defines suit as ‘the attempt to gain an end by legal process: prosecution of a right before any tribunal.’
“We ... note that a broader definition of the term ‘suit’ reflects more accurately the modern realities of our legal system. As the legal community and state and federal legislatures struggle to relieve the ever-increasing burdens on our courts and the constantly rising costs of litigation, a gravitation is evident toward less formal and more expeditious means of dispute resolution. This movement has manifested itself in the growing use of arbitration, as well as increased authority given to administrative agencies to resolve disputes, so that the functional equivalents of suits brought in a court of law have developed.[10] As is discussed in more detail below, this point is particularly valid in the context of CERCLA actions, where the Legislature has deliberately and painstakingly developed a system in which a PRP has every incentive to ‘voluntarily5 cooperate with the EPA, before actual litigation,[11] and where significant legal prejudice may develop if the PRP fails to do so.[12]
*704 “Therefore, we find the term ‘suit’ as used in the insurance policies at issue, to be ambiguous and capable of application to legal proceedings initiated in other than a traditional court setting.
“Having determined that the term ‘suit’ is capable of application to nonjudicial legal proceedings, we must next determine whether the PRP letter received by Bronson did, in fact, constitute the initiation of a suit under the subject insurance policies. Once again, the jurisdictions are split on this issue.
“Some courts have found that a typical PRP letter from the EPA constitutes the initiation of a suit, thereby giving rise to the duty to defend. Those courts have emphasized the particular nature of CERCLA-related actions, and the unique authority given to the EPA to develop an essentially binding record and to design and implement actions that the PRPs may later be held liable for. See, e.g., Coalcley v. Maine Bonding & Casualty Co., 136 N.H. 402, 416-419, 618 A.2d 777 (1992); Hazen Paper Co. v. United States Fidelity & Guaranty Co., 407 Mass. 689, 696-699, 555 N.E.2d 576 (1990).
“In contrast, other jurisdictions have declined to impose a duty to defend absent a more definitive and directive EPA action, e.g., an order to undertake site investigation or cleanup. Those courts have tended to focus on the ‘voluntary’ participation sought by the EPA, as well as the lack of certainty that litigation would ensue if the PRP failed to comply. See, e.g., Ryan v. Royal Ins. Co. of America, 916 F.2d 731, 741 (C.A.1 1990); Avondale Industries, Inc. v. Travelers Indemnity Co., 887 F.2d 1200, 1206 (C.A.2 1989), cert. den., 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990).
“In determining whether a ‘suit’ was initiated in the present ease, we must examine the contents of the PRP letter received by Bronson. In pertinent part, that letter informed Bronson that the EPA had identified it as a potentially responsible party for contamination at the North Bronson Industrial Area. Barring an immediate offer from any of the PRPs to conduct a remedial investigation and feasibility study (RI/FS), the EPA would undertake to complete one. If the EPA did so, under the terms of 42 U.S.C. § 9607(a), Bronson could be held jointly and severally liable for ‘all costs associated with the removal or remedial action and all other necessary costs incurred in cleaning up the site, including investigation, planning and enforcement.’ Further, the EPA required Bronson to submit documentation regarding any waste it had released onto the site. Failure to comply with this demand could result in civil action and fines.
“Taking into account the various components of this PRP letter and its ramifications, we find that the legal proceeding initiated by the receipt of that notice is the functional equivalent of a suit brought in a court of law.[13] Of critical importance is the creation of the administrative record and the i*ole it may play in future litigation. Documentation sought by the EPA, and which Bronson must produce under the force of law, will determine the amount and type of *705 waste generated by Bronson and discharged onto the site. Given the strict liability stance of CERCLA, this information is all that is needed to establish both the fact and proportional share of Bronson’s liability at the site.[14]
“Moreover, because the EPA may implement any investigatory and remedial action it deems necessary at the site, subject only to an abuse of discretion review,[15] the total cost of the project will also be determined before litigation is brought. The significant authority given to the EPA in such matters allows it essentially to usurp the traditional role of a court of law in determining and apportioning liability. Such matters are concluded by the EPA before the action is ever brought to court.
“The EPA’s powers may also be viewed as coercing the ‘voluntary’ participation of PRPs. The entire CERC-LA scheme revolves around ‘encouraging’ PRPs to engage in voluntary cleanups. Only in so doing may a PRP have a voice in developing the record that will be used against it and in determining the amount of its liability through selection of investigatory and remedial methods and procedures. The significance of these incentives is underscored by the fact that EPA-conducted CERCLA actions have histori *706 cally been considerably and, some would suggest, needlessly more expensive than those actions conducted by PRP groups.
“Finally, we note, from a policy perspective, that the position urged by defendants would only increase the litigiousness of this already extensively litigated area of the law. Limiting an insurer’s duty to defend to an actual court proceeding preceded by a complaint would merely encourage PRPs to decline ‘voluntary’ involvement in site cleanups, waiting instead for an actual lawsuit to be brought in order to receive insurance coverage. This would have the effect of substantially protracting the cleanup of contaminated sites.
“We find that the term ‘suit,’ as used in the insurance policies at issue, is ambiguous and capable of application to nontraditional legal actions that are the functional equivalent of a suit brought in a court of law. We further hold that, under this definition, the PRP letter received by Bronson constituted the initiation of a ‘suit’ that the insurers were obliged to defend under the terms of their insurance policies.”
445 Mich, at 567-75, 519 N.W.2d at 869-72 (some emphasis added; some footnotes omitted).
Similarly, in Hazen Paper Co. v. United States Fidelity & Guaranty Co., 407 Mass. 689, 555 N.E.2d 576 (1990), we find this helpful discussion:
“Since the standard [CGL] policy language was drafted, the EPA processes for the enforcement of obligations to aid in the cleaning up of environmental pollution have moved away from the use of lawsuits toward the use of agency demands for participation in remedial action. Those requests are dangerous for the alleged polluter to ignore because they often result in dispositive, extrajudicial solutions. The consequences of the receipt of the EPA letter were so substantially equivalent to the commencement of a lawsuit that a duty to defend arose immediately. The EPA letter was not the equivalent of a conventional demand letter based on a personal injury claim. See Aetna Casualty & Sur. Co. v. Gulf Resources & Chem. Corp., 709 F.Supp. 958, 960 (D.Idaho 1989) ....
“Hazen’s obligation to respond positively to the EPA letter was strong. The prospects of avoiding financial responsibility were minimal because liability is not based on fault (§ 9607[a] [1982 & Supp. V 1987]) and the available defenses are very limited (§ 9607[b]). Moreover, the risk to which Hazen was exposed was substantial because, as a practical matter, its liability is joint and several. See O’Neil v. Picillo, 883 F.2d 176, 178-179 (1st Cir.1989), cert. denied sub nom. American Cyanamid Co. v. O’Neil, 493 U.S. 1071 ... (1990). Early involvement in the settlement discussions is thus often crucial to protect one’s interests. Any court action by EPA is limited to the administrative record (§ 9613[j][l] [1982 & Supp. V 1987]), and judicial review considers only whether the EPA ‘decision was arbitrary and capricious or otherwise not in accordance with law1 (§ 9613[j][2]). Thus participation in the development of that record can be crucial. Settlement of EPA claims against potentially responsible parties (see §§ 9613[f][2], 9622[d]), with protection against claims for contribution (§ 9613[f][2]), is a desired goal. The situation was such that the opportunity to protect Hazen’s interests could well have been lost, long before any lawsuit would be brought. It would be naive to characterize the EPA *707 letter as a request for voluntary action. Hazen had no practical choice other than to respond actively to the letter.”
407 Mass, at 695-97, 555 N.E.2d at 580-82 (footnotes omitted).
Finally, the Supreme Court of Nebraska recently analyzed the issue as follows:
“Continental [the insurer] argues that letters or administrative orders of environmental agencies are not ‘suits’ triggering a duty to defend, relying on Foster-Gardner, Inc. v. Nat. Union Fire Ins., 18 Cal.4th 857, 959 P.2d 265, 77 Cal.Rptr.2d 107 (1998). In that ease, the insured was ordered by the state EPA to remediate pollution. The insured sued its insurers when they refused to defend. The insurers argued that the word ‘suit,’ as used in the policies, meant ‘a civil action commenced by filing a complaint. Anything short of this is a “claim.” ’ Id. at 878, 959 P.2d at 279, 77 Cal.Rptr.2d at 121. The court stated that the policies at issue required the insurers to defend a ‘suit’ but that the policies allowed discretion to investigate and settle a ‘claim.’
“The trial court concluded that a PRP letter is akin to a ‘suit,’ based upon ‘the severity and significant repercussions’ if Dutton took no action. It noted that insurance companies such as Continental which insure for this type of damage have common knowledge of the outcome when the EPA is involved in addressing contaminations. The court relied on two cases: Aetna Cas. and Sur. Co., Inc. v. Pintlar Corp., 948 F.2d 1507 (9th Cir. 1991), and Anderson Development Co. v. Travelers Indem. Co., 49 F.3d 1128 (6th Cir.1995).
“In Aetna Cas. and Sur. Co., Inc. v. Pintlar Corp., 948 F.2d at 1517, the court held:
“ ‘[T]he EPA’s administrative claims against the insureds triggered insurers’ duty to defend. Coverage should not depend on whether the EPA may choose to proceed with its administrative remedies or go directly to litigation. A fundamental goal of CERC-LA [Comprehensive Environmental Response, Compensation, and Liability Act of 1980] is to encourage and facilitate voluntary settlements. Interim Guidance on Notice Letters, Negotiations, and Information Exchange, EPA Memorandum, 53 Fed. Reg. 5298 (1988). It is in the nation’s best interests to have hazardous waste cleaned up effectively and efficiently. But the insured is not required to submit to, and may in fact wish to oppose[,] the threat. In either event, the insurer’s duty to defend may well be triggered.’
“The federal court stated that a PRP notice differs from a ‘garden variety demand letter’ in that it carries ‘immediate and severe implications,’ rather than simply exposing a party to a potential threat of future litigation. Aetna Cas. and Sur. Co., Inc. v. Pintlar Corp., 948 F.2d at 1516. ‘[T]he PRP’s substantive rights and ultimate liability are affected from the start of the administrative process.’ Id.
The court further noted that it may be ‘more prudent for the PRP to undertake the environmental studies and cleanup measures itself than to await the EPA’s subsequent suit in a cost recovery action.’ Id. at 1517. ‘Lack of cooperation may expose the insured, and potentially its insurers, to much greater liability, including the EPA’s litigation costs.’ Id. As a result, ‘an “ordinary person” would believe that the receipt of a PRP notice is the effective commencement of a “suit” necessitating a legal defense.’ Id. *708 Tf the threat is clear then coverage should be provided. The filing of an administrative claim is a clear signal that legal action is at hand.’ Id. at 1518.
“In Anderson Development Co. v. Travelers Indent. Co., 49 F.3d at 1132, the federal court applied a recent Michigan case in which the state court determined that a PRP letter ‘constituted the initiation of a suit triggering [the insurer’s] duty to defend.’ The federal court agreed with the state court’s conclusion that a PRP letter issued by the EPA can be considered the ‘functional equivalent of a “suit” brought in a court of law.’ Id. at 1131 [ (applying Michigan Millers Mut. Ins. Co. v. Bronson Plating Co., 445 Mich. 558, 565, 519 N.W.2d 864, 868 (1994)) ].
“... We agree with the rationale in Aetna Cas. and Sur. Co., Inc. v. Pintlar Corp., supra, and Anderson Development Co. v. Travelers Indent. Co., supra. Whether an insurer is required to provide coverage on a policy should not be dependent on whether the EPA proceeds with administrative remedies or files litigation. A PRP letter is the functional equivalent of a ‘suit’ as described in the insurance policies, and[,] therefore, the insurers had a duty to defend Dutton. The PRP letter from the EPA carried with it the EPA’s coercive powers. Dutton conducted an investigation to determine whether it was a PRP and determined that it was. Dutton proceeded to plan for remediation and developed new methods in an attempt to save further expense.
“The term ‘suit’ can be readily understood to apply to actions that are the functional equivalent of a suit filed in a court of law. The PRP letter advised Dutton that it was immediately at risk. If Dutton declined the necessary response, its substantive rights and ultimate liability were affected from the receipt of the PRP letter. As noted in Aetna Cas. and Sur. Co., Inc. v. Pintlar Co'i'p., 948 F.2d 1507 (9th Cir.1991), an ordinary person would believe that the receipt of a PRP letter was in effect the commencement of a suit. The language of an insurance policy should be considered in accordance with what a reasonable person in the position of the insured would have understood it to mean. The threats of the letter were clear and carried immediate implications. The trial court was correct in finding there was a ‘suit.’ Continental’s cross-appeal on this issue has no merit.”
Dutton-Lainson Co. v. Continental Ins. Co., 279 Neb. 365, 381-85, 778 N.W.2d 433, 446-49 (2010) (citation omitted).
As noted, we find the reasoning employed by a majority of the supreme courts of our sister states, as typified by the opinions quoted above, to be persuasive. The authority given the EPA in regard to determining liability on the part of PRPs, while not absolute, is very nearly so. Given the severe penalties for failure to cooperate and other enforcement tools available to the EPA, a decision by the EPA to designate an insured as a PRP cannot on any practical level be understood as anything less that the initiation of a “legal action” constituting a “suit” within the contemplation of the insurance contract at issue.
A contrary decision by us — and, in particular, a decision to focus solely upon those dictionary definitions of “suit” that refer to “court” proceedings to the exclusion of those that more broadly reference “legal actions” and, especially, “attempts to gain an end by legal process” — would put us at odds with the substantial body of sound precedent to the effect that the term “suit” in CGL policies includes arbitration *709 proceedings. See, e.g., Michigan Millers, 445 Mich, at 585, 519 N.W.2d at 876; Vaubel Farms, Inc. v. Shelby Farmers Mut., 679 N.W.2d 407 (Minn.Ct.App.2004).
Furthermore, relying upon such definitions simply would be irreconcilable with “ ‘[t]he vast majority of courts around the United States [that] have found that all kinds of coercive administrative actions are “suits” covered by general liability insurance policies.’ ” State v. CNA Ins. Cos., 172 Vt. 318, 324, 779 A.2d 662, 667 (2001) (quoting Governmental Interinsurance Exch. v. City of Angola, 8 F.Supp.2d 1120, 1130 (N.D.Ind.1998)). The Supreme Court of North Carolina, for example, has noted that so-called “compliance orders,” although not issued by a court, are in fact “an attempt by the State to ‘gain an end by legal process.’ ” CD. Spangler Constr. Co. v. Industrial Crankshaft & Eng’g Co., 326 N.C. 133, 154, 388 S.E.2d 557, 570 (1990); see also A.Y. McDonald Indus., Inc. v. Insurance Co. of N. Am., 475 N.W.2d 607 (Iowa 1991). Of particular relevance for our purposes, the Supreme Court of North Carolina further observed:
“Reading the policies as a whole and assuming none of the exclusions apply, we find that a ‘reasonable person in the position of the insured’ may not have understood the term ‘suit’ as limiting appellees’ duty to defend until a court proceeding had been instigated. See Grant v. Insurance Co., 295 N.C. [39,] 43, 243 S.E.2d [894,] 897 [ (1978) ]; Financial Services v. Capitol Funds, 288 N.C. [122,] 143, 217 S.E.2d [551,] 565 [ (1975) ]. Because this Court must give effect to reasonable interpretations which favor the policyholder, we conclude that the term ‘suit’ as used in the policies covers the compliance orders. See Woods v. Insurance Co., 295 N.C. [500,] 506, 246 S.E.2d [773,] 777 [ (1978) ].”
C.D. Spangler, 326 N.C. at 154-55, 388 S.E.2d at 570 (emphasis added).
For the foregoing reasons, we answer in the affirmative the question certified to this Court.
MOTION TO STRIKE GRANTED; QUESTION ANSWERED.
MALONE, C.J., and WOODALL, STUART, BOLIN, PARKER, and MAIN, JJ., concur.
MURDOCK, SHAW, and WISE, JJ., dissent.

1. The issue whether the facts in this case give rise to an “occurrence” within the meaning of the policy is not before this Court.

. The parties disagree as to the exact number of supreme courts on each side of the issue, but it appears that at least 10 state supreme courts have held that PRP letters or a letter from the state’s environmental agency equivalent of the EPA constitutes a "suit” and at least 2 others have held that a court action is not necessary to satisfy the "suit” requirement in a standard CGL policy. Three state supreme courts have concluded that PRP letters are not "suits.” The courts that constitute the majority joined by this Court today include those of Nebraska, Connecticut, Kentucky, Wisconsin, Colorado, Vermont, Minnesota, Michigan, New Hampshire, and Massachusetts. See Dutton-Lainson Co. v. Continental Ins. Co., 279 Neb. 365, 778 N.W.2d 433 (2010); R.T. Vanderbilt Co. v. Continental Cos. Co., 273 Conn. 448, 870 A.2d 1048 (2005); Aetna Cas. & Sur. Co. v. Commonwealth, 179 S.W.3d 830 (Ky.2005); Johnson Controls, Inc. v. Employers Ins. of Wausau, 264 Wis.2d 60, 665 N.W.2d 257 (2003); Compass Ins. Co. v. City of Littleton, 984 P.2d 606 (Colo.1999); State v. CNA Ins. Cos., 172 Vt. 318, 324, 779 A.2d 662, 667 (2001); SCSC Corp. v. Allied Mut. Ins. Co., 536 N.W.2d 305 (Minn.1995), overruled on other grounds by Bahr v. Boise Cascade Corp., 766 N.W.2d 910 (Minn.2009); Michigan Millers Mut. Ins. Co. v. Bronson Plating Co., 445 Mich. 558, 519 N.W.2d 864 (1994), overruled on other grounds by Wilkie v. Auto-Owners Ins. Co., 469 Mich. 41, 664 N.W.2d 776 (2003); Coakley v. Maine Bonding & Cos. Co., 136 N.H. 402, 618 A.2d 777 (1992); and Hazen Paper Co. v. United States Fid. & Guar. Co., 407 Mass. 689, 555 N.E.2d 576 (1990). See also C.D. Spangler Constr. Co. v. Industrial Crankshaft & Eng’g Co., 326 N.C. 133, 154, 388 S.E.2d 557, 570 (1990) (holding that state environmental compliance orders "were an attempt by the State to 'gain an end by legal process’ ” and therefore constituted a “suit” for purposes of the insured's CGL policy); and A.Y. McDonald Indus., Inc. v. Insurance Co. of N. Am., 475 N.W.2d 607 (Iowa 1991) (to similar effect).
The state supreme courts that have adopted the minority view include those of California, Illinois, and Maine. See Foster-Gardner, Inc. v. National Union Fire Ins. Co., 18 Cal.4th 857, 959 P.2d 265, 77 Cal.Rptr.2d 107 (1998); Lapham-Hickey Steel Corp. v. Protection Mut. Ins. Co., 166 Ill.2d 520, 211 Ill.Dec. 459, 655 N.E.2d 842 (1995); and Patrons Oxford Mut. Ins. Co. v. Marois, 573 A.2d 16 (Me.1990).
In addition, courts of appeal and some federal courts have addressed the issue, with divided results.

“ 8Some courts have found this division of authority to be, itself, conclusive evidence that ambiguity exists. See, generally, anno: Division of opinion among judges on same court or among other courts or jurisdictions considering same question, as evidence that particular clause of insurance policy is ambiguous, 4 A.L.R.4th 1253. We do not adopt that *703 view. Nevertheless, we do find the division of authority to be instructive and to at least lend credence to the position that more than one reasonable interpretation of the term exists. C. & J. Commercial Driveway, Inc. v. Fidelity & Guaranty Fire Corp., 258 Mich. 624, 629, 242 N.W. 789 (1932) (A split of authority demonstrates ‘at least that [the term] is of doubtful meaning and requires construction’).

“ 10Even outside the environmental arena, courts have defined the term ‘suit’ broadly and found it to encompass arbitration, Madawick Contracting Co. v. Travelers Ins. Co., 307 N.Y. 111, 117-119, 120 N.E.2d 520 (1954), and administrative proceedings. Solo Cup Co. v. Federal Ins. Co., 619 F.2d 1178, 1188, n. 7 (7th Cir.1980), cert. den., 449 U.S. 1033, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980); Campbell Soup Co. v. Liberty Mutual Ins. Co., 239 N.J.Super. 488, 496-499, 571 A.2d 1013 (1988), aff'd, 239 N.J.Super. 403, 571 A.2d 969 (1990); School Dist. No. 1, Multnomah Cty. v. Mission Ins. Co., 58 Or.App. 692, 703-704, 650 P.2d 929 (1982); Community Unit School Dist. No. 5 v. Count[r]y Mutual Ins. Co., 95 Ill.App.3d 272, 278-279, 50 Ill.Dec. 808, 419 N.E.2d 1257 (1981).

“ 11There is no question that PRPs, as well as the government, could benefit from less litigation in this area. The transaction costs related to ameliorating a CERCLA site can be staggering. In a recently published study, the experiences of 108 PRPs at eighteen superfund sites were examined. It was concluded that those PRPs spent an average of $1.24 million on site-related costs between 1981 *704 and 1991. Of that amount, some twenty-one percent, or $260,000 per PRP was spent on transaction costs, primarily legal fees. Dixon, Drezner & Hammitt, Private-sector cleanup expenditures and transaction costs at 18 Superfund sites (RAND, 1993).

“ 12See, generally, note, The best equitable defense is a good offense, 29 Nat. Resources J. 849 (1989).

“ 13In making this determination, we are cognizant of the concern raised by the insurers that a decision in plaintiffs favor might blur the distinction between ‘claim’ and ‘suit’ evidenced in their insurance policies. While the policies reserve for the insurer the right to investigate any ‘claim,’ the insurers’ duty to defend extends only to a ‘suit.’ In response to this concern, we wish to emphasize that this opinion should in no way be viewed as intimating that evei’y request for relief should be considered the initiation of a suit that the insurers are obliged to defend. Rather, our determination on this issue is made primarily based on the unique aspects of CERCLA actions and the authority given to EPA under the statute. As explained by the Ninth Circuit Court of Appeals in Aetna Casualty & Surety Co., Inc. v. Pintlar Corp., 948 F.2d 1507, 1516-1517 (9th Cir.1991):
“ ‘Unlike the garden variety demand letter, which only exposes one to a potential threat of future litigation, a PRP notice carries with it immediate and severe implications. Generally, a party asserting a claim can do nothing between the occurrence of the tort and the filing of the complaint that can adversely affect the insureds’ rights. However, in a CERCLA case, the PRP’s substantive rights and ultimate liability are affected from the start of the administrative process. Avondale Industries, Inc. v. Travelers Indem. Co., 697 F.Supp. 1314, 1321 (S.D.N.Y., 1988) (“Adverse consequences can befall an insured during the administrative pollution cleanup process”), aff'd 887 F.2d 1200 (2nd Cir.1989).’
“Accordingly, we do not disturb the basic claim/suit distinction contained within the subject insurance policies.

“ 14 42 U.S.C. § 9607(a). Defenses to CERCLA liability are virtually nonexistent. 42 U.S.C. § 9607(b).

“ 15 42 U.S.C. § 9613(j)(2) provides that the government’s selection of a response action will be upheld ‘unless the objecting party can demonstrate, on the administrative record, that the decision was arbitrary and capricious or otherwise not in accordance with law.’