# IN THE SUPREME COURT OF TEXAS

═══════════

No. 14-0465

═══════════

MCGINNES INDUSTRIAL MAINTENANCE CORPORATION, APPELLANT,

v.

THE PHOENIX INSURANCE COMPANY AND THE TRAVELERS INDEMNITY COMPANY,
APPELLEES

═══════════════════════════

ON CERTIFIED QUESTION FROM THE UNITED STATES
COURT OF APPEALS FOR THE FIFTH CIRCUIT

═══════════════════════════

JUSTICE BOYD, joined by JUSTICE JOHNSON, JUSTICE GUZMAN, and JUSTICE LEHRMANN, dissenting.

If you do not like your insurance policy, the Supreme Court of Texas can now change it for you. Never mind all those times the Court has said "we may neither rewrite the parties' contract nor add to its language."[1] Forget that we have repeatedly said "[i]f an insurance contract uses

---

[1] *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003); *see also, e.g.*, *FPL Energy, LLC v. TXU Portfolio Mgmt. Co.*, 426 S.W.3d 59, 68 (Tex. 2014) (refusing to "selectively import terms" into a contract); *State Farm Lloyds v. Johnson*, 290 S.W.3d 886, 893 (Tex. 2009) (holding that appraisers cannot "rewrite the policy"); *DiGiuseppe v. Lawler*, 269 S.W.3d 588, 600 (Tex. 2008) (rejecting dissenting view that "would essentially rewrite the parties' contract"); *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 50 (Tex. 2008) (declining to "rewrite the parties' contract [or] add to its language") (quoting *Schaefer*, 124 S.W.3d at 162); *In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 191 (Tex. 2007) ("As allowing these affiliates to compel arbitration would effectively rewrite their contracts, we hold they cannot."); *Fortis Benefits v. Cantu*, 234 S.W.3d 642, 649 (Tex. 2007) ("[W]e are loathe to judicially rewrite the parties' contract by engrafting extra-contractual standards[.]"); *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 753 (Tex. 2006) ("[C]ourts must enforce the contract as made by the parties, and cannot make a new contract for them[.]"); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 231 (Tex. 2003) (refusing to judicially "edit the document for comprehension, and then rewrite it to ensure its enforceability"); *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 888 (Tex. 1998) ("Our decisions have repeatedly emphasized that courts 'cannot make contracts for [the] parties.'") (quoting *Gulf Prod. Co. v. Kishi*, 103 S.W.2d 965, 968 (Tex. 1937), which in turn quotes *Freeport Sulphur Co. v. Am. Sulphur Royalty Co. of Tex.*, 6 S.W.2d

unambiguous language, we will . . . enforce it as written."[2] Ignore our former commitment to

interpreting insurance policies by relying on the "ordinary, everyday meaning of its words to the

general public."[3] Disregard our prior conviction that a contract's language is the best

1039, 1040 (Tex. 1928));*Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996) ("We have long held that courts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained."); *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 572–73 (Tex. 1996) (refusing to "rewrite the parties' bargained-for contract"); *Cherokee Water Co. v. Forderhause*, 741 S.W.2d 377, 379 (Tex. 1987) ("A court is without power to make a contract that the parties did not make[.]"); *Dall. Power & Light Co. v. Cleghorn*, 623 S.W.2d 310, 312 (Tex. 1981) ("[A] court does not have the power to place a different interpretation upon the contract on grounds of policy that it would be better for the lessor or landowners generally to have the contract different.") (quoting 2 W. SUMMERS, OIL AND GAS § 373 (1959));*Transp. Ins. Co. v. Standard Oil Co. of Tex.*, 337 S.W.2d 284, 289 (Tex. 1960) ("Courts are without authority to rewrite contracts, even insurance contracts.") (quoting *Am. Auto. Ins. Co.*, 327 S.W.2d 519, 528 (Mo. Ct. App. 1959), which in turn quotes *Forir v. Toman*, 202 S.W.2d 32, 34 (Mo. 1947)), *overruled in part on other grounds by Commercial Standard Ins. Co. v. Am. Gen. Ins. Co.*, 455 S.W.2d 714 (Tex. 1970); *Provident Fire Ins. Co. v. Ashy*, 162 S.W.2d 684, 687 (Tex. 1942) ("Parties make their own contracts, and it is not within the province of this court to vary their terms in order to protect them from the consequences of their own oversights and failures in nonobservance of obligations assumed.") (quoting *Dorroh-Kelly Mercantile Co. v. Orient Ins. Co.*, 135 S.W. 1165, 1167 (Tex. 1911)); *E. Tex. Fire Ins. Co. v. Kempner*, 27 S.W. 122, 122 (Tex. 1894) ("[W]here the language is plain and unambiguous, courts must enforce the contract as made by the parties, and cannot make a new contract for them, nor change that which they have made under the guise of construction."); *Dalton v. Rust*, 22 Tex. 133, 146 (1858) ("[B]y what authority can the court assume to make a contract for the parties, to which neither have assented?").

    [2] *In re Deepwater Horizon,* No. 13-0670, ___ S.W.3d ___, ___, 2015 WL 674744, at *9 (Tex. Feb. 13, 2015); *see also, e.g.*, *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 451 (Tex. 2011) ("[A]n unambiguous contract will be enforced as written[.]") (quoting *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) (per curiam)); *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008) ("If an insurance contract uses unambiguous language, we must enforce it as written."); *David J. Sacks*, 266 S.W.3d at 450 ("An unambiguous contract will be enforced as written[.]"); *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 862 (Tex. 2000) ("When a contract is unambiguous we will enforce it as written."); *State Farm Fire & Cas. Co. v. Reed*, 873 S.W.2d 698, 699 (Tex. 1993) ("If the policy is worded so that it can be given only one reasonable construction, it will be enforced as written."); *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 732 (Tex. 1981) ("Since we agree the lease is unambiguous, we shall confine our review to the lease and enforce it as written."); *Life Ins. Co. of Sw. v. Overstreet*, 603 S.W.2d 780, 783 (Tex. 1980) ("[T]he contract is enforceable as written[.]"); *Royal Indem. Co. v. Marshall*, 388 S.W.2d 176, 181 (Tex. 1965) ("Courts cannot make new contracts between the parties, but must enforce the contracts as written."); *Universal C. I. T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 157 (Tex. 1951) (stating that an unambiguous "contract will be enforced as written").

    [3] *Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 766 (Tex. 2014); *see also, e.g.*, *U.S. Fid. & Guar. Co. v. Goudeau*, 272 S.W.3d 603, 607 (Tex. 2008) ("Under Texas law, we are required to construe insurance policies according to their plain language, using 'the ordinary, everyday meaning of the words to the general public.'") (quoting *Fiess*, 202 S.W.3d at 746); *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 8 (Tex. 2007) ("Terms that are not defined in a policy are given their generally accepted or commonly understood meaning.").

representation of what the parties mutually intended.[4] Those are just rules of construction, and we have only followed them because they support freedom of contract,[5] promote transactional stability and predictability,[6] and facilitate industry and commerce.[7] As it turns out, those objectives are now provisional, and like a contract, the Court's precedential opinions are just words on paper, so you cannot assume we really meant what we chose to say.

At times, the Court's members have characterized other members' opinions as ignoring these rules while claiming to follow them.[8] The Court makes no such pretentions today. Instead, it

---

[4] *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010); *see also, e.g.*, *Fiess*, 202 S.W.3d at 746 ("As with any other contract, the parties' intent is governed by what they said, not by what they *intended* to say but did not.").

[5] *See, e.g.*, *Nafta Traders, Inc. v. Quinn*, 339 S.W.3d 84, 95–96 (Tex. 2011) (observing that freedom of contract is a fundamental Texas policy and "contracts when entered into freely and voluntarily shall be held sacred") (quoting *Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 664 (Tex. 2008)); *Fortis Benefits*, 234 S.W.3d at 648–49 ("Where a valid contract prescribes particular remedies or imposes particular obligations, equity generally must yield unless the contract violates positive law or offends public policy. This Court has 'long recognized a strong public policy in favor of preserving the freedom of contract.'") (quoting *Lawrence v. CDB Servs., Inc.*, 44 S.W.3d 544, 554 (Tex. 2001)); *Gym–N–I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 (Tex. 2007) ("Freedom of contract allows parties to bargain for mutually agreeable terms and allocate risks as they see fit.").

[6] *See, e.g.*, *Sonat Exploration Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 235 (Tex. 2008) ("Enforcing contracts according to their own terms satisfies the relevant policies of the forum, enhances certainty, predictability, and uniformity of result, and facilitates commerce and relations with other states and nations."); *Frank's Casing*, 246 S.W.3d at 51 (observing that "rewrit[ing] the parties' contract" would "take[] a step back from predictability in the law relat[ing] to business transactions in Texas").

[7] *See, e.g.*, *Sonat Exploration*, 271 S.W.3d at 235; *Frank's Casing*, 246 S.W.3d at 51; *Chesapeake Operating, Inc. v. Nabors Drilling USA, Inc.*, 94 S.W.3d 163, 177 (Tex. App.—Houston [14th Dist.] 2002, no pet.) ("Industry and commerce cannot operate in a climate that allows a contracting party who makes a bad bargain to change the terms of a deal at its option.").

[8] *See, e.g.*, *Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660, 676–78 (Tex. 2008) (Hecht, J., joined by Johnson, J., dissenting) ("A few days ago, . . . the Court 'proclaimed itself "loathe to judicially rewrite the parties' contract by engrafting extra-contractual standards"'. . . . Either the Court thinks that imposing additional duties on an insurer does not entail rewriting the policy, or else it does not find that effort quite as loathesome.") (quoting *Frank's Casing*, 246 S.W.3d at 45, which in turn quotes *Fortis Benefits*, 234 S.W.3d at 649); *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 208 (Tex. 2004) (Hecht, J., joined by Owen, J., dissenting) ("What the Justices in today's majority really meant by the assertion in *Schaefer* was that 'we may neither rewrite the parties' contract nor add to its language *unless we believe we should.*'") (quoting *Schaefer*, 124 S.W.3d at 162); *Read v. Scott*

flatly abandons the rules and openly superimposes a meaning onto the term "suit" that the Court concedes to be outside the term's ordinary meaning, unsupported by the context, and indisputably beyond what the contracting parties actually contemplated. Today the Court demonstrates that it can and will rewrite your insurance policy if it wants to. We may look beyond the policy's words to decide what we think you must (or should) have meant. We will even make up our own definitions so your words can mean something completely new. Why would the Court do this, in spite of everything we've always said about construing insurance policies? Because it seems like a good thing to do here (and on top of that, everyone else is doing it). My law professors (and my momma) taught me better. I respectfully dissent.

## I.
## "Suit"

The policies at issue require the Insurers to "defend any *suit* against [McGinnes] seeking damages on account of" covered bodily injury or property damage. (Emphasis added.) Separately, the policies require the Insurers to indemnify McGinnes by paying "all sums [McGinnes] shall become legally obligated to pay as *damages* because of" covered bodily injury or property damage "caused by an occurrence." (Emphasis added.) And finally, the policies give the Insurers the right (but not the duty) to "make such investigation and settlement of any *claim or suit* it deems expedient." (Emphasis added.) The issue here is whether the policies require the Insurers to defend McGinnes against notices, requests, demands, and orders that the federal Environmental Protection Agency (EPA) sent to McGinnis as a "potentially responsible party" (PRP) under the federal

---

*Fetzer Co.*, 990 S.W.2d 732, 745 (Tex. 1998) (Abbott, J., joined by Owen, J., dissenting) ("In essence, the Court rewrites [the contract] to require Kirby to assume control over dealer selection.").

Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA). *See* 42 U.S.C. §§ 9601–28.

The policies obligate the Insurers to defend a "suit," and as the Court concedes, the EPA's letters and orders under CERCLA do not fit within the ordinary meaning of "suit." When McGinnes purchased these policies in the 1960s, dictionaries defined "suit" to mean a proceeding in a court or tribunal.[9] This Court has repeatedly done the same. *See Schwartz v. Jefferson*, 520 S.W.2d 881, 886 (Tex. 1975) (defining "suit" as "any proceeding in a court of justice by which an individual pursues that remedy in a court of justice which the law affords him") (quoting *Nat'l Life Co. v. Rice*, 167 S.W.2d 1021, 1023 (Tex. 1943)); *see also H.H. Watson Co. v. Cobb Grain Co.*, 292 S.W. 174, 176 (Tex. 1927) (same) (quoting *Weston v. City Council of Charleston*, 27 U.S. 449, 454 (1829)). So has the United States Supreme Court, from which we first quoted our definition. *See Weston*, 27 U.S. at 454; *Fed. Hous. Admin., Region No. 4 v. Burr*, 309 U.S. 242, 247 n.8 (1940); *Upshur Cnty. v. Rich*, 135 U.S. 467, 474 (1890); *Kohl v. United States*, 91 U.S. 367, 375–76 (1875); *Case of Sewing Mach. Cos.*, 85 U.S. 553, 585 (1873); *Ex parte Milligan*, 71

---

[9] AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1287 (1969) ("[a]ny proceeding in court to recover a right or claim"); BLACK'S LAW DICTIONARY 1603 (rev. 4th ed. 1968) ("any proceeding by one person or persons against another or others in a court of justice in which the plaintiff pursues, in such court, the remedy which the law affords him for the redress of an injury or the enforcement of a right, whether at law or in equity"); RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1421 (unabridged ed. 1966) ("the act, the process, or an instance of suing in a court of law; legal prosecution; lawsuit"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 2286 (1961) ("the attempt to gain an end by legal process: prosecution of a right before any tribunal; an action or process in a court for the recovery of a right or claim: a legal application to a court for justice"); WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY OF THE ENGLISH LANGUAGE 1822 (2d ed. 1964) ("action to secure justice in a court of law; attempt to recover a right or claim through legal action"); WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 2522 (2d ed. 1954) ("the following or attending upon a court to obtain justice there; hence the attempt to gain an end by legal process; an action or process in a court for the recovery of a right or claim; legal application to a court for justice; prosecution of right before any tribunal; as a civil or criminal suit; a suit in chancery").

U.S. 2, 112–13 (1866).[10] Faced with this clear precedent, the Court agrees today that the common, ordinary meaning of "suit" is "a proceeding in court." *Ante* at __.[11]

And the context, in which the policies contrast the term "suit" with the term "claim," confirms that the parties intended the ordinary meaning of "suit." The policies provide that the Insurers "may make [an] investigation and settlement of any *claim or suit* it deems expedient," but they only "have the right and duty to defend any *suit*." (Emphases added.) This distinction between a "suit" and a "claim" is also consistent with the common, ordinary meaning of the term "claim," which is "a demand for compensation or an assertion of a right to be paid," *Johnson & Higgins of*

---

[10] In 2006, the Supreme Court relied on this definition, in connection with its discussion of the term "action," to hold that a statute of limitations applied to judicial proceedings but not to administrative proceedings. *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006). The Court explained that "in 1966, . . . a commonly used legal dictionary defined the term 'right of action' as '[t]he right to bring suit; a legal right to maintain an action,' with 'suit' meaning 'any proceeding . . . in a court of justice.'" *Id.* (quoting BLACK'S LAW DICTIONARY 1488, 1603 (4th ed. 1951)). We have likewise recognized that "[t]he term 'action' is generally synonymous with 'suit,' which is a demand of one's rights in court." *Thomas v. Oldham*, 895 S.W.2d 352, 356 (Tex. 1995). Although the word "suit" can be "more general in its comprehension than the word 'action,'" both terms refer to a judicial proceeding in which parties assert claims for relief. *H.H. Watson*, 292 S.W. at 176. "Historically, 'action' referred to a judicial proceeding in a court of law, while 'suit' referred to a proceeding in a court of equity." *Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 564 (Tex. 2014) (plurality op.) (citing BLACK'S LAW DICTIONARY 28–29 (7th ed. 1999)).

[11] McGinnes does not give up so easily. It relies on two of the dictionary definitions, which include the phrase "the attempt to gain an end by legal process," *see* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE at 2286; WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE at 2522, and argues that "suit" can include any effort to obtain something through a "legal process." McGinnes misrepresents the definitions, however, as neither of them uses the phrase as a complete, stand-alone definition of "suit." Webster's New International Dictionary of the English Language ties the phrase specifically to court proceedings: "the following or attending upon a court to obtain justice there; *hence* the attempt to gain an end by legal process; an action or process in a court for the recovery of a right or claim." WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE at 2522 (emphasis added). The word "hence" indicates that an "attempt to gain an end by legal process" is a "suit" *because* it is "the following or attending upon a court to obtain justice there." *See id.*; *see also* MERRIAM-WEBSTER'S DICTIONARY AND THESAURUS 391 (2014) (defining "hence" to mean "because of a proceeding fact or premise"). Similarly, Webster's Third New International Dictionary does not use the phrase as an independent definition of the word "suit," but instead uses it as part of a single sub-definition that directly associates it with a legal proceeding: "the attempt to gain an end by legal process : prosecution of right before any tribunal : LITIGATION." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE at 2286 (def. 3b). Thus, as the Court agrees, the common, ordinary meaning of "suit" is a legal proceeding in a court or tribunal.

*Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 531 (Tex. 1998), "[t]he assertion of an existing right; any right to payment or to an equitable remedy," BLACK'S LAW DICTIONARY 281–82 (9th ed. 2009), or "[t]he aggregate of operative facts giving rise to a right enforceable by a court," *id*. at 281. A claim is thus similar in this context to a "cause of action," at least in the sense that they both "may exist before a *suit* is instituted." *Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 564 (Tex. 2014) (plurality op.) (emphasis added) (quoting *Magill v. Watson*, 409 S.W.3d 673, 679 (Tex. App.—Houston [1st Dist.] 2013, no pet.)). A "claim" is readily distinguishable from a "suit" if both words are given their common, ordinary meanings. A party may make a "claim" merely by asserting a legal right or remedy against the insured, and the Insurers may elect to investigate or settle that claim even in the absence of any further actions. But to bring a "suit," the party must invoke the authority of a court or tribunal to adjudicate the claim, and only that kind of action will trigger the Insurers' duty to defend.

EPA letters and orders do not fall within the common, ordinary meaning of the term "suit," and the policies' context does not in any way indicate the contrary. Under our well-established rules for construing insurance contracts, that should end the matter. Unfortunately, the Court proceeds, unrestrained by those rules.

## II.
### "Suits . . . Conducted Outside a Courtroom"

McGinnes argues that, even if the term "suit" means proceedings in a court or tribunal, we should construe the term to include EPA letters and orders because they are the "functional equivalent" of a "suit." The obvious problem with this argument is the policies require the Insurers

to defend a "suit," not "the functional equivalent of a suit,"[12] and "we may neither rewrite the parties' contract nor add to its language."[13] *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003). Undeterred by such formalities, the Court concludes that "EPA proceedings" are not just the "functional equivalent of a suit," they are, "in actuality, . . . the suit itself, only conducted outside a courtroom." *Ante* at ___. The Court provides three justifications for its newly invented definition: (1) CERCLA did not exist when the parties entered their contract; (2) environmental cleanup costs can qualify as "damages" under the policies; and (3) most other courts have reached a similar conclusion. None convinces me, but more importantly, our well-established rules of construction do not recognize any of the Court's reasons as a legitimate basis for ignoring or rewriting the unambiguous language of an insurance policy.

## A.    The Policies Predate CERCLA

The Court asserts that EPA letters and orders under CERCLA are the modern equivalent of what would have been a suit at the time the policies were written. *Ante* at __. It assumes that

---

[12] *See Foster-Gardner, Inc. v. Nat'l Union Fire Ins. Co.*, 959 P.2d 265, 280 (Cal. 1998) ("[T]he unambiguous language of the policies obligated the insurers to defend a 'suit' not . . . the 'substantive equivalent' of a 'suit.'"); *Johnson Controls, Inc. v. Emp'rs Ins. of Wausau*, 665 N.W.2d 257, 305 (Wis. 2003) (Wilcox, J., dissenting) (noting the insured "did not contract to be defended when it faced the 'functional equivalent of a suit'; it contracted to be defended from 'suits'").

[13] Another significant problem with this argument is the difficulty of determining what is and is not the "functional equivalent" of a "suit." Federal and state courts adopting the functional-equivalent approach continue to face a myriad of disputes over this issue. *See, e.g.*, *Gull Indus., Inc. v. State Farm Fire & Cas. Co.*, 326 P.3d 782 (Wash. Ct. App. 2014) (dispute over whether letter from Department of Energy is functional equivalent of suit); *Pac. Hide & Fur Depot v. Great Am. Ins. Co.*, 23 F. Supp. 3d 1208 (D. Mont. 2014) (dispute over whether PRP letter under CECRA is functional equivalent of suit); *Anderson Bros. v. St. Paul Fire & Marine Ins. Co.*, 729 F.3d 923 (9th Cir. 2013) (dispute over whether demand for information under CERCLA is functional equivalent of a suit); *Nucor Corp. v. Emp'rs Ins. Co. of Wausau*, 296 P.3d 74, 81–82 (Ariz. Ct. App. 2012) (dispute over whether letter from state department of environmental quality is functional equivalent of suit); *Melssen v. Auto-Owners Ins. Co.*, 285 P.3d 328 (Colo. App. 2012) (dispute over whether notice of claim under state statute governing construction defects is functional equivalent of suit).

McGinnes and the Insurers intended the policies to cover the kinds of expenses at issue here, but they fell a little short because they defined coverage according to the mechanism the EPA used to impose environmental cleanup costs at the time ("suits") instead of using a broader term that would include the mechanism the EPA now uses to impose such costs. The Court supports this conclusion by describing the EPA's CERCLA activities as particularly onerous, one-sided prosecutions, implying that if McGinnes and the Insurers intended the Insurers to pay for the defense of pollution lawsuits, surely they intended the Insurers to pay the costs associated with this far more draconian means of compelling companies to remediate their past pollution. I am not convinced, for at least three reasons.

First, the post-policy changes to the EPA's enforcement authority provide no basis for the Court's rewriting of the insurance policies here. "Prior to the passage of pollution control laws, which began in the late 1960s, there was no dispute over the meaning of the term 'suit' as used in CGL insurance policies. It was generally understood that a 'suit' was initiated with the traditional summons and complaint." 48 A.L.R. 5th 355, § 2[a] (1997). The parties contracted for a duty to defend "suits" and only "suits," expressly granting the Insurers discretion as to whether to defend against or settle "claims" that were not asserted in a "suit." The Court replaces these ordinary meanings with some other, as-yet undefined meanings. The Court denies that its holding extends the Insurers' duty to defend "to every demand letter," but does not say when a demand letter is a "claim" like any other demand letter and when it is a "suit." *Ante* at __.

Similarly, the Court denies that its holding extends the Insurers' duty to defend to "all administrative proceedings," but does not say which administrative proceedings will amount to a "suit," like those under CERCLA, and which administrative proceedings will not. *Ante* at __. The

9

Court simply says that "a simple demand letter threatening or prefacing a lawsuit is nothing like a PRP letter or unilateral administrative order," *ante* at __, and "EPA enforcement proceedings are unusual," *ante* at __. The difference that the Court finds between CERCLA demand letters and other demand letters, and the difference between CERCLA investigations and other administrative proceedings, appears to be the severity of the potential ramifications of failing to cooperate with the EPA. But neither the EPA's PRP letters nor its unilateral administrative orders are self-executing under CERCLA. As with any party who receives a demand letter, a PRP has the right to deny the EPA's accusations and force the EPA to bring suit. *See* 42 U.S.C. §§ 9607(a)(4)(A), (C), 9613(b), (e), (f), (g); *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 114 (D.C. Cir. 2010).

No doubt, CERCLA strongly incentivizes voluntary compliance and grants the EPA substantial power to obtain it. But the EPA can only compel a PRP's compliance by pursuing its claims against the PRP in court. *See Gen. Elec.*, 610 F.3d at 114. As the D.C. Circuit has explained, the EPA's four options for cleaning up a contamination site are to (1) negotiate a settlement with the PRPs, *see* 42 U.S.C. § 9622; (2) clean up the site itself and seek reimbursement from PRPs in a subsequent suit, *see id.* §§ 9604(a), 9607(a)(4)(A); (3) file an abatement action in federal district court to compel PRPs to conduct the clean-up, *see id.* § 9606; or (4) issue a unilateral administrative order instructing PRPs to clean the site. *Gen. Elec.*, 610 F.3d at 114. The unilateral administrative order is the only option that does not involve a voluntary settlement or proceedings in a court of law. *Id.* But unlike a court's judgment or a settlement agreement, PRPs are not legally compelled to comply with unilateral administrative orders. Instead, they have the "choice" to "refuse to comply with the [order], in which case the EPA may either bring an action in federal district court to enforce the [order] against the noncomplying PRP . . . or clean the site itself and

10

then sue the PRP to recover costs." *Id.* at 115. In other words, while CERCLA provides for strict liability and grants the EPA extensive power to enforce its provisions, it does not render the EPA judge and jury of a PRP's liability. Instead, a "suit" is necessary to impose liability against the PRP's will, and nothing in CERCLA's scheme transforms the EPA's "claim" into a "suit," under the common, ordinary meanings of those terms.

Second, the facts do not support the Court's assumption that McGinnes and the Insurers would have chosen to insure against the defense expenses if they had anticipated them. Contrary to the Court's suggestion, the policies were not written at a time when the EPA was imposing liability for violation of federal environmental regulations through suits rather than administrative processes. Instead, they were written at a time when neither the EPA nor the modern federal environmental regulatory scheme existed at all. The EPA was created in December 1970, after both policies were drafted and executed.[14] Nor did extensive federal regulation of pollution exist when the policies were drafted. Before 1970, pollution control was left primarily to the states, which had done very little to implement and enforce pollution remediation requirements on private companies.[15] We cannot presume that McGinnes and the Insurers anticipated that the federal

---

[14] *See* THE GUARDIAN: ORIGINS OF THE EPA, www2.epa.gov/aboutepa/origins-epa (last visited June 18, 2015). Private citizen actions were first authorized under federal law that same year. *See* Edward Lloyd, *Citizens Suits and Defenses Against Them*, 59 A.L.I. 781, 812 (2009) ("Citizen suit provisions in environmental statutes originated in the Clean Air Act in 1970.").

[15] *See* A. Myrick Freeman III, *Environmental Policy Since Earth Day I: What Have We Gained?*, 16 J. OF ECON. PERSPECTIVES 125, 125 (2002) ("Earth Day I, which occurred on April 22, 1970, is an appropriate starting point for examination of the economic benefits and costs that have been realized through United States environmental policy. There were federal laws on the books dealing with air and water pollution prior to that date. But those laws placed primary responsibility for the implementation and enforcement of pollution control requirements on states, and by 1970, they had not accomplished very much.").

government (or any government) would impose on McGinnes the kind of substantial environmental cleanup costs at issue here through judicial proceedings rather than an administrative process because we cannot presume that they anticipated that the federal government (or any government) would impose these kind of costs at all. The kind of massive pollution liability that exists under modern environmental regulation did not exist when these policies were drafted.

Moreover, the Court's assumption that McGinnes and the Insurers intended coverage for pollution cleanup costs is further undermined by the reality of what happened when the EPA and governmental pollution liability did come into existence. In 1970, the year the EPA and the modern age of federal environmental regulation and enforcement were born, the insurance industry drafted an exclusion that denied coverage for pollution under standard-form CGL policies.[16] The 1970 pollution exclusion was incorporated into the standard-form CGL policy in 1973.[17] In short, the Court's assumption that the parties anticipated the kinds of pollution-related costs at issue here and intended the "duty to defend any suit" to cover them finds no support in reality. The kinds of costs that McGinnes incurred here were largely nonexistent when it purchased these policies, and if it had purchased them a few years later, after Congress created the EPA and enacted substantial environmental regulation, a standard-form CGL policy would have excluded them from coverage.

---

[16] *See* BRITTON D. WEIMER ET AL., CGL POLICY HANDBOOK § 5.01[A] (2d ed. 2013).

[17] The 1970 pollution exclusion contained an exception for "sudden and accidental" pollution, which was later eliminated, *see id.* § 5.01[A], but that exception does not appear to be implicated by the facts underlying this coverage dispute.

12

Third, even if the Court were correct that McGinnes and the Insurers would have written their policies to cover CERCLA response costs if they had known that such activities would someday take place outside of judicial proceedings, Texas law does not permit courts to rewrite the parties' policies to say what the parties might have wanted them to say if they had contemplated subsequent events. "[T]he parties' intent is governed by what they said, not by what they *intended* to say but did not." *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006). "[I]t is not for this court to vary the terms of the contract into which the parties entered, nor to speculate as to what might or might not have been the consequences if the contract had been differently expressed." *Dorroh-Kelly Mercantile Co. v. Orient Ins. Co.*, 135 S.W. 1165, 1167 (Tex. 1911). As the author of today's opinion has himself explained, to "divine the parties' reasonable expectations and then rewrite the contract accordingly, is contrary to the bedrock principle of American contract law that parties are free to contract as they see fit." *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 208 n.9 (Tex. 2004) (Hecht, J., joined by Owen, J., dissenting) (quoting *Wilkie v. Auto–Owners Ins. Co.*, 664 N.W.2d 776, 782 (Mich. 2003)). We cannot infer that the parties must have intended the policies to cover non-existent forms of "proceedings" that might one day arise. Even if that had been their unexpressed intent, we must determine their intent from the words they actually used, and the word "suit" does not include such proceedings.

## B. Coverage for "Damages"

The Court's second reason for imposing a duty to defend here is that courts in other jurisdictions have construed the policies' coverage for "damages" to include CERCLA cleanup costs—i.e., that the Insurers have a duty to indemnify against such costs. The Court reasons that "[t]o interpret the policies as covering the damages incurred as a result of pollution cleanup

13

proceedings without giving the Insurers the right and duty to defend those proceedings creates perverse incentives and consequences for insurers and insureds alike." *Ante* at ___. The Court then identifies possible disincentives and indicates that these possibilities, whether likely or not, "illustrate the problem with a duty to indemnify without a duty or right to defend." *Ante* at ___.

This ground for rewriting the parties' policies is problematic for several reasons. First, it presupposes this Court's ruling on a question that we have never decided and that is not presented here. Not all courts have agreed that CERCLA cleanup costs are "damages" under a CGL policy. *See, e.g., Indus. Enters., Inc. v. Penn Am. Ins. Co.*, 637 F.3d 481, 489–90 (4th Cir. 2011) (noting that the standard CGL policy language preceded the enactment of CERCLA in 1980 and finding no evidence that subsequently created CERCLA liabilities somehow became automatically includable in the term "property damage" upon the enactment of CERCLA, without any change to the policy language). We have never addressed that issue, and we need not (and thus cannot) do so here.

Second, even if the term "damages" includes CERCLA cleanup costs that the insured voluntarily accepts without any court proceedings, the Court ignores the policies' distinction between the Insurers' duty to indemnify and their duty to defend. "The duty to defend and the duty to indemnify are distinct and separate duties." *King v. Dall. Fire Ins. Co.*, 85 S.W.3d 185, 187 (Tex. 2002). If we treat the two duties as the same, we render meaningless the contract's express distinction between them. This we cannot do, even if we think our approach represents better policy and better alignment of the parties' interests and incentives.

Third, recognizing the contract's distinction between the duty to defend and the duty to indemnify does not necessarily create "perverse incentives." *See ante* at ___. If in fact the Insurers'

14

duty to indemnify requires them to pay all liabilities that the insured voluntarily incurs in response to a PRP letter or administrative order, the policies incentivize the Insurers to investigate and settle those claims promptly to minimize their potential liabilities. But that presents a different question than whether the Insurers must provide a defense or reimburse the costs the insured incurs in responding to the EPA's demands.

According to the policies' language, the Insurers must "pay on behalf of [McGinnes] all sums which [McGinnes] shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies," and may elect to investigate and settle "any claim or suit it deems expedient." But we are asked in this case whether they must defend McGinnes against the EPA's demands and orders, and under the policies' language that duty applies only to a "suit" seeking such damages. The policies' use of the term "damages," even if construed to include pre-suit liabilities (an issue not presented here), is consistent with the common, ordinary meaning of the term "suit" to define the Insurers' duty to defend.

## C.   Everybody's Doing It.

The Court's third reason for construing the policies to require the Insurers to defend against CERCLA activities is that most other jurisdictions are doing it. *See ante* at __ (following the majority position to "strive for uniformity as much as possible") (quoting *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 824 (Tex. 1997)). As the Court points out, its position is the majority position, and the more recent opinions have followed the majority position.[18] *See ante* at

---

[18] *See, e.g.*, *Anderson Bros.*, 729 F.3d at 934 (treating all PRP letters, and even section 9604 requests for information, as "suits" under the functional-equivalent approach regardless of content); *Travelers Cas. & Sur. Co. v. Ala. Gas Corp.*, 117 So. 3d 695, 696 (Ala. 2012) ("Taking into account the various components of this PRP letter and

\_\_. But a number of courts in other jurisdictions have rejected that position, for the text-based reasons that Texas law has adhered to until today.[19]

While we desire to create uniformity when construing insurance forms used in multiple jurisdictions, the Court candidly admits that we cannot achieve uniformity here. *Ante* at \_\_\_ (recognizing that "[w]e cannot achieve uniformity with our decision; the courts have already

---

its ramifications, we find that the legal proceeding initiated by the receipt of that notice is the functional equivalent of a suit brought in a court of law."); *R.T. Vanderbilt Co. v. Cont'l Cas. Co.*, 870 A.2d 1048, 1058 (Conn. 2005) ("[W]e find that '[t]he consequences of the receipt of the EPA letter [are] so substantially equivalent to the commencement of a lawsuit that a duty to defend [arises] immediately." ") (citing *Hazen Paper Co. v. U.S. Fid. & Guar. Co.*, 555 N.E.2d 576, 581 (Mass. 1990)); *Mich. Millers Mut. Ins. Co. v. Bronson Plating Co.*, 519 N.W.2d 864, 866 (Mich. 1994) ("[T]he term 'suit,' as used in the insurance policies at issue, is ambiguous and capable of application to legal actions, other than court proceedings, that are the functional equivalent of a suit brought in a court of law."), *overruled in part on other grounds by Wilkie*, 664 N.W.2d 776.

[19] *See, e.g.*, *Ray Indus., Inc. v. Liberty Mut. Ins. Co.*, 974 F.2d 754, 761 (6th Cir. 1992) ("We believe that 'suit' has a plain and unambiguous meaning that excludes the PRP letter in this case. In common usage, a suit generally involves an adjudicatory proceeding in a court of law.") (analysis based on Sixth Circuit's interpretation of Michigan law, but Michigan Supreme Court later concluded in *Mich. Millers Mutual*, 519 N.W.2d at 868–70, that word "suit" was ambiguous in this context); *Harleysville Mut. Ins. Co., Inc. v. Sussex Cnty., Del.*, 831 F. Supp. 1111, 1132 (D. Del. 1993) ("The Court is mindful of the serious nature of the letters from the EPA advising the County of its potential CERCLA liability. However, the insurance policies at issue in this case limit the insurers['] duty to defend to 'suits' and the Court will not deprive the insurers of the benefit of their bargain by forcing them to defend against an administrative proceeding, no matter how serious the consequences of that proceeding might be to the insured."), *aff'd,* 46 F.3d 1116 (3d Cir. 1994); *id.* ("Pursuant to [CERCLA], the EPA can file a lawsuit against a PRP . . . or it can contact the PRP and try to secure its voluntary cooperation as it did in this case. Recognizing the difference in these approaches provides a clear line of demarcation between situations that do and do not trigger the insurer's duty to defend."); *Foster-Gardner*, 959 P.2d at 280 ("The primary attribute of a 'suit,' as that term is *commonly* understood, is that parties to an action are involved in actual court proceedings initiated by the filing of a complaint."); *id.* at 279 ("[T]he policies do not treat the terms 'suit' and 'claim' as interchangeable, but consistently treat them separately. This careful separation indicates that the insurers' differing rights and obligations with respect to 'suit[s]' and 'claim[s]' were deliberately and intentionally articulated in the policies.") (citation omitted); *id.* at 280 ("There is nothing in the policy language to support the interpretation that some pre-complaint notices are 'suits' and some are not. Rather, the unambiguous language of the policies obligated the insurers to defend a 'suit' not . . . the 'substantive equivalent' of a 'suit.'"); *id.* at 287 ("Our conclusion that a 'suit' is a court proceeding initiated by the filing of a complaint creates a 'bright-line rule that, by clearly delineating the scope of risk, *reduces* the need for future litigation.'"); *Lapham-Hickey Steel Corp. v. Prot. Mut. Ins. Co.*, 655 N.E.2d 842, 847 (Ill. 1995) (agreeing with the "group of courts that have found that the word 'suit' is unambiguous and have given the word its plain meaning, which requires the commencement of some action in a court of law before an insurer's duty to defend is triggered; thus, the issuance of a PRP letter does not invoke the duty to defend"), *as modified on denial of reh'g* (Oct. 2, 1995); *id.* at 847–48 ("If all of the policy's language is to be given effect, then the words 'suit' and 'claim' . . . must have different meanings. . . . If the word "suit" was broadened to include claims, in the face of policy language which distinguishes between the two, any distinction between these two words would become superfluous.").

split"). Under such circumstances, when the "tests already in use render uniformity impossible," we "adhere to the law of Texas" and refuse to "stretch[]" the "plain meaning" of a policy's terms. *U.S. Fid. & Guar. Co. v. Goudeau*, 272 S.W.3d 603, 608 (Tex. 2008). "Under Texas law, we are required to construe insurance policies according to their plain language," *id.* at 607, and we have never ignored a policy's plain language simply to achieve uniformity among the different jurisdictions. Even if we were to do so, we should not do it here, when "[w]e cannot achieve uniformity with our decision [because] the courts have already split." *Ante* at ___.

### III.
### Conclusion

Less than four years ago, this Court explained that the circumstances surrounding the execution of a contract may shed light on the meaning of its words, but we must rely on the words themselves to determine the contract's effect:

> Understanding the context in which an agreement was made is essential in determining the parties' intent *as expressed in the agreement,* but it is the parties' expressed intent that the court must determine. Extrinsic evidence cannot be used to show that the parties probably meant, or could have meant, something other than what their agreement stated.

*Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 451 (Tex. 2011). Today the author of that opinion agrees that the term "suit" means "an attempt through process in court," yet relies on extrinsic circumstances and other jurisdictions' holdings to conclude that the term "must also include CERCLA enforcement proceedings by the EPA," even though he agrees they are not "an attempt through process in court." *Ante* at __. This is a disturbing decision, not because of its effect on these parties or the insurance policies at issue, but because of its effect on Texas law. I can only hope that today's decision will soon be seen as a fluke, an oversight, and a rare misstep by a Court that has otherwise been steadfastly committed to enforcing contracts as

17

written, to refraining from rewriting parties' agreements, and to determining the parties' intent by relying on the ordinary meanings of the terms the parties choose.

For these reasons, I respectfully dissent.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: June 26, 2015