

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| TRANS-VAC SYSTEMS, LLC, | § | No. 08-22-00232-CV |
| Appellant, | § | Appeal from the |
| v. | § | 171st Judicial District Court |
| HUDSON INSURANCE COMPANY, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 2022-DCV-0258) |

**<u>MEMORANDUM OPINION</u>**

This is an interlocutory appeal from an order denying a motion to compel arbitration filed by Appellant Trans-Vac Systems, LLC (Trans-Vac) in which it sought to arbitrate its dispute with Appellee Hudson Insurance Company (Hudson) arising under a performance bond that Hudson had issued to Trans-Vac's subcontractor, MGB Group, Inc. (MGB), on a construction project. The bond itself did not contain an arbitration agreement, but the contract between Trans-Vac and MGB did, which was incorporated by reference into the performance bond. We conclude, however, that the parties' arbitration agreement only applied to disputes between Trans-Vac and MGB arising under the terms of the construction contract and therefore did not bind Hudson to arbitrate disputes arising solely under the performance bond. And here, because the only dispute between the parties centered on Hudson's affirmative defense that Trans-Vac was time-barred from seeking payment from Hudson under the terms of the bond itself, we agree with the trial court's order denying Trans-Vac's motion to compel arbitration.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Trans-Vac and MGB enter into a subcontract

Trans-Vac is a specialized contractor that provides and installs pneumatic waste collection and transport systems. In 2014, a general contractor (the Prime Contractor) that had been hired by the US Army Corps of Engineers to build a new healthcare complex at the Fort Bliss Army Base in El Paso, Texas (the Project) hired Trans-Vac to construct a pneumatic laundry service for the complex. In turn, Trans-Vac contracted with MGB "to perform a portion of the work . . . that had been assigned to Trans-Vac" for $600,000 (the Subcontract). The Subcontract contained various provisions requiring MGB to perform its work to Trans-Vac and the U.S. Army's satisfaction in compliance with applicable laws and rules. It also explained the dispute resolution proceedings to be followed in the event of a dispute between the two parties, with arbitration governed by the Federal Arbitration Act (FAA) and under the American Arbitration Association's (AAA) rules as the final step.

### B.  Hudson issues its performance bond

The Subcontract required MGB to furnish performance and payment bonds to Trans-Vac's satisfaction.[1] In compliance therewith, in February of 2015, MGB entered into a "subcontract performance bond" agreement with Hudson as the surety (the Performance Bond). The Performance Bond provided that if Trans-Vac declared MGB in default, (1) Hudson could "promptly remedy the default subject to the provisions of paragraph 3 herein," or (2) after reasonable notice to Hudson, Trans-Vac could arrange for the completion of MGB's performance (or Hudson could demand that Trans-Vac complete the performance). If the latter option was chosen, and if Trans-Vac complied with its obligations under the bond, Hudson would be obligated

---

[1] The contract provided that: "Subcontractor shall at its sole expense, on bond forms furnished by, and with a surety satisfactory to Contractor: (i) furnish a performance bond for the full amount of the sum identified in Exhibit A as security for the faithful performance of this Subcontract (the "Performance Bond")."

to pay Trans-Vac its reasonable costs in completing MGB's work to the extent the cost of completion exceeded the balance of the amount owed on the $600,000. Hudson also issued a subcontract labor and material payment bond to ensure payment to MGB's subcontractors.

## C. Trans-Vac notifies MGB of its default and completes MGB's work

The record reflects that MGB completed a portion of its work, and Trans-Vac paid MGB $230,692 of the $600,000 contract amount.[2] However, MGB allegedly defaulted on its contractual obligations to Trans-Vac sometime prior to July 2016, shortly before MGB's owner passed away. When Hudson learned of the possibility that MGB was in default—presumably due to MGB's failure to pay its subcontractors—Hudson sent a letter to Trans-Vac dated July 15, 2016, demanding that Trans-Vac not further pay MGB without Hudson's written consent. The record does not indicate whether Trans-Vac ever responded to this letter.

On July 18, 2016, Trans-Vac sent a formal notice to MGB regarding its default under the Subcontract, giving it 24 hours to take corrective action. When MGB failed to take corrective action, Trans-Vac chose to complete the work through a different subcontractor and thereafter charge the costs of completion to MGB.[3] However, the record does not indicate that Trans-Vac notified Hudson of MGB's default at that time.

## D. Hudson refuses Trans-Vac's demand for payment

Almost two years later, on March 5, 2018, Trans-Vac sent a letter formally notifying Hudson of MGB's default and advising Hudson that it had hired another subcontractor to perform MGB's remaining work on the Project. Trans-Vac enclosed the letter that it had sent to MGB in

---

[2] The Subcontract required MGB to submit monthly payment applications for its work, and upon approval, Trans-Vac was to remit payment to MGB monthly. Final payment to MGB was dependent upon approval of the entities involved as well as upon the Prime Contractor's payment to Trans-Vac.

[3] The Subcontract provided that after notifying MGB of its default, Trans-Vac had the right to supply its own workers and materials to complete the agreed-upon work; to hire subcontractors to complete the work; or to withhold payment to MGB while giving MGB the opportunity to take "corrective action" to complete the work itself. If Trans-Vac completed the work itself or through subcontractors, the costs of doing so would be charged to MGB.

July of 2016 regarding its default, as well as an itemized statement reflecting that Trans-Vac had already paid MGB $230,692 of the agreed-upon $600,000 for its initial work but that it had cost Trans-Vac $1,058,966 to complete the remaining work. Trans-Vac therefore requested payment of its excess costs of $458,966, stating that this amount reflected the damages it incurred from MGB's default.

In response, on May 7, 2018, Hudson sent a letter to Trans-Vac, stating that it was assuming Trans-Vac had elected its remedy under the Subcontract to complete MGB's work upon its default. However, Hudson advised Trans-Vac that because it had failed to provide Hudson with timely notice of MGB's default, this "prejudiced Hudson from exercising its bargained-for-right to mitigate damages by arranging for the completion of the work under the Subcontract." It further advised Trans-Vac that it had "voided the Bond" by failing to give Hudson timely notice and that Trans-Vac's "claim on the bond must be denied."

It does not appear that Trans-Vac took any further action against Hudson at that time. Thereafter, according to Trans-Vac, the Project struggled with a number of delays unrelated to its own performance, and Trans-Vac did not receive final payment from the Prime Contractor on the Project until April of 2021.

### E. Trans-Vac demands arbitration

In December of 2021, Trans-Vac filed a demand for arbitration against Hudson with the American Arbitration Association (AAA), seeking "damages stemming from [MGB's] default and [Hudson's] improper denial of the resulting claim and failure to reimburse [Trans-Vac]." Hudson, however, objected to the arbitration, and informed Trans-Vac and the AAA that it would not voluntarily participate in the arbitration.[4]

---

[4] Initially, Hudson objected to holding the arbitration in Colorado, where Trans-Vac was incorporated, but shortly thereafter objected to the arbitration in its entirety.

4

### F. Hudson files suit and Trans-Vac counterclaims

In January of 2022, Hudson filed its petition in the trial court seeking the following declaratory relief : "1) that Trans-Vac's claim against Hudson's performance bond is time-barred under the contractual limitations period set forth in the performance bond; and 2) that Trans-Vac's claim against Hudson's bond is not arbitrable because Hudson does not have an arbitration agreement with Trans-Vac and it is not a signatory to the alleged arbitration agreement [contained in the Subcontract] between Trans-Vac and MGB." Hudson's contention that Trans-Vac's claim was time-barred centered on two provisions in the Performance Bond. First, it pointed to the provision stating that: "[a]ny suit under this bond must be instituted before the expiration of two years from date on which final payment under the subcontract falls due." Second, it pointed to a rider that was attached to the Performance Bond, stating that Chapter 2253 of the Texas Government Code applied. The rider provided as follows:

> **Notice of Applicability of Chapter 2253 of the Texas Government Code** These bonds are furnished in an attempt to comply with Chapter 2253 of the Texas Government Code. These bonds shall be construed to comply with such Chapter regarding the rights created, limitations on those rights, and remedies provided. Any provision in the bonds to which this Rider is attached that expands or restricts a right or liability under such Chapter shall be disregarded, and such Chapter shall apply to these bonds.

Hudson pointed out that a suit under a performance bond issued under Chapter 2253 (relating to public work contracts) must be brought within one year after a contractor abandons a project. *See* TEX. GOV'T CODE ANN. § 2253.078 (a) ("[a] suit on a performance bond [under this Chapter] may not be brought after the first anniversary of the date of final completion, abandonment, or termination of the public work contract"). And Hudson argued that it was "undisputed that MGB abandoned the Project in June, 2016," thereby rendering Trans-Vac's claims "time-barred" as of June of 2017, or at the latest, June of 2018. Hudson therefore requested

5

a stay of the arbitration until its claim for declaratory relief could be resolved, as well as attorney's fees and costs.

Trans-Vac filed a response to Hudson's petition and also filed a counterclaim against Hudson alleging a breach of contract for its failure to remit payment on the Performance Bond, while reserving its right to compel Hudson to arbitrate their dispute. Trans-Vac further opposed Hudson's request to stay the arbitration. Hudson answered the counterclaim, raising several affirmative defenses, including the applicable statutes of limitations; Trans-Vac's failure to mitigate damages; Trans-Vac's alleged prior breach of contract; equitable estoppel; waiver; lack of causation; and lack of damages, in effect blaming Trans-Vac's negligence for the extra costs that it incurred in completing the Project.

### G. Trans-Vac files a motion to compel arbitration

Trans-Vac thereafter filed a motion to compel arbitration, arguing that Hudson was bound by the arbitration agreement in the Subcontract due to its incorporation by reference in the Performance Bond. Hudson opposed the motion, again arguing that it was not bound by the arbitration agreement as it was not a signatory to the agreement. Hudson further argued that the arbitration agreement only applied to disputes between Trans-Vac and MGB arising from MGB's performance under the contract, and that the dispute between Trans-Vac and Hudson only related to Hudson's defenses under the Performance Bond, i.e., whether Trans-Vac timely notified Hudson of MGB's default to give Hudson the opportunity to remedy MGB's default on its own, and whether Trans-Vac's claim was time-barred under the terms of the Performance Bond due to its failure to bring suit in a timely manner as required by the Performance Bond.

### H. The trial court denies arbitration and Trans-Vac appeals

In April of 2022, the trial court held a hearing on Trans-Vac's motion to compel arbitration, together with Hudson's motion to stay the arbitration. After the trial court notified the parties by

email that it intended to deny Trans-Vac's motion to compel arbitration, Hudson nonsuited all of its claims against Trans-Vac "save and except the request for a declaration that Trans-Vac's claim against the performance bond issued by Hudson for the subject project is time-barred by one or more applicable statutes or periods of limitations." The trial court thereafter entered its order denying Trans-Vac's motion to compel arbitration.

This appeal followed. In one issue, Trans-Vac contends that the trial court erred by denying its motion to compel arbitration, arguing that Hudson was bound by the arbitration provisions in the Subcontract based on the Subcontract's incorporation by reference in the Performance Bond. We disagree.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

### A. Determining whether a dispute is subject to arbitration

A party seeking to compel arbitration has the burden to prove that (1) a valid and enforceable arbitration agreement exists, and (2) the claims raised fall within that agreement's scope.[5] *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 233 (Tex. 2003); *see also Rachal v. Reitz*, 403 S.W.3d 840, 843 (Tex. 2013); *In re Rubiola*, 334 S.W.3d 220, 223 (Tex. 2011).

A trial court's determination regarding the validity and scope of an arbitration agreement are questions of law that we review de novo. *Baby Dolls Topless Saloons, Inc. v. Sotero*, 642 S.W.3d 583, 586 (Tex. 2022) (whether an arbitration agreement is valid is reviewed de novo); *Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115 (Tex. 2018) (whether a claim falls within the scope of a valid arbitration agreement is reviewed de novo).

---

[5] Trans-Vac contends that our interpretation of the arbitration agreement should be governed by the FAA, as the agreement itself stated that the arbitration was to be governed by the FAA and because the parties are incorporated in different states. *See In re ReadyOne Indus., Inc.*, 294 S.W.3d 764, 769 (Tex. App.—El Paso 2009, no pet.) (recognizing that the FAA may apply in both instances). As Hudson points out, however, even if the FAA were to apply, it only preempts state law to the extent the laws are in conflict. *See In re D. Wilson Const. Co.*, 196 S.W.3d 774, 779 (Tex. 2006) (holding that the FAA only preempts *contrary* state law not consonant state law (emphasis in the original)). Here, we see no conflict between the FAA and state law in terms of determining whether Hudson is bound to the Subcontract's arbitration agreement.

7

The question of whether a valid and enforceable agreement exists includes proving that both parties consented to the agreement. *See Aerotek, Inc. v. Boyd*, 624 S.W.3d 199, 204 (Tex. 2021). Thus, although the law generally favors arbitration, it does not create an obligation to arbitrate where none exists; arbitration is a "matter of consent, not coercion," and a party may not be compelled to arbitrate where it has not consented to do so. *See Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) (arbitration "is a matter of consent, not coercion"); *see also In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005) (while there is a strong policy favoring arbitration, this policy does not apply to the initial determination of whether there is a valid arbitration agreement binding on a party). Therefore, despite "strong presumptions that favor arbitration, a valid agreement to arbitrate is a settled, threshold requirement to compel arbitration." *Kmart Stores of Tex., L.L.C. v. Ramirez*, 510 S.W.3d 559, 564 (Tex. App.—El Paso 2016, pet. denied).

Once the moving party establishes a valid and binding arbitration agreement, a presumption exists that the parties' dispute falls within the scope of the agreement, and "courts must resolve any doubts about an arbitration agreement's scope in favor of arbitration." *See In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 754 (Tex. 2001); *see also Rubiola*, 334 S.W.3d at 225 (in determining the agreement's scope, courts employ a "strong presumption in favor of arbitration"). Nonetheless, "the strong policy in favor of arbitration cannot serve to stretch a contractual clause beyond the scope intended by the parties or to allow modification of the unambiguous meaning of the arbitration clause." *Carter v. ZB, Nat'l Ass'n*, 578 S.W.3d 613, 619 (Tex. App.—Houston [14 thDist.] 2019, no pet.); *see also FD Frontier Drilling (Cyprus), Ltd. v. Didmon*, 438 S.W.3d 688, 694 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (same); *Gerwell v. Moran*, 10 S.W.3d 28, 31 (Tex. App.—San Antonio 1999, no pet.) (same). In other words, "[e]ven the exceptionally strong policy favoring arbitration cannot justify requiring litigants to forego a judicial remedy

when they have not agreed to do so." *Carr v. Main Carr Dev., LLC*, 337 S.W.3d 489, 496 (Tex. App.—Dallas 2011, pet. denied) (citing *E.E.O.C. v. Waffle House Inc.*, 534 U.S. 279, 293– 94 (2002).

"Arbitration agreements are interpreted under traditional contract principles." *J.M. Davidson, Inc.*, 128 S.W.3d at 227. In determining the scope of an arbitration within a contract, a court "must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract." *FirstMerit Bank*, 52 S.W.3d at 754 (citing *J.M. Davidson,* 128 S.W.3d at 229). Even though arbitration clause wording may be broad, language elsewhere in the agreement may limit its scope. *Id.* Moreover, in determining "whether a party's claims fall within an arbitration agreement's scope, we focus on the complaint's factual allegations rather than the legal causes of action asserted." *FirstMerit Bank*, 52 S.W.3d at 754; *see also Rubiola*, 334 S.W.3d at 224–26.

### B.    Determining whether an arbitration agreement binds a nonsignatory

Normally, because arbitration is contractual in nature, only parties to an arbitration agreement can be compelled to arbitrate. *See Kellogg*, 166 S.W. 3d at 737–39 (citing *Bridas S.A.P.I.C. v. Government of Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003); *see also Rubiola*, 334 S.W.3d at 224 (Tex. 2011) (ordinarily, "parties must sign arbitration agreements before being bound by them"). However, Texas courts have long recognized the six theories, arising out of common principles of contract and agency law, that may bind non-signatories to arbitration agreements: "(1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel, and (6) third-party beneficiary." *Kellogg,* 166 S.W.3d at 739; *see also Taylor Morrison of Tex., Inc. v. Ha*, 660 S.W.3d 529, 532 (Tex. 2023) ("[N]onparties may be bound to an arbitration clause when the rules of law or equity would bind them to the contract generally."). Here, Trans-Vac relies solely on the theory of incorporation by reference, pointing out that the

Subcontract containing the arbitration provision was incorporated by reference into the Performance Bond and arguing Hudson was therefore bound to arbitrate any and all disputes with Trans-Vac.

The parties agree that the question of whether Hudson, as a nonsignatory, is bound by the agreement is a gateway matter for the court to determine. *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009) (whether an arbitration agreement binds a nonsignatory is a gateway matter to be determined by courts rather than by arbitrators unless the parties clearly and unmistakably provide otherwise) (citing *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 130 (Tex. 2005); *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83–84 (2002)); *see also Jody James Farms, JV v. Altman Group, Inc.*, 547 S.W.3d 624, 631-32 (Tex. 2018) (whether a nonsignatory is bound by an arbitration agreement is a matter for "judicial determination").[6] And, in line with the general principle that the party seeking to compel arbitration has the burden to establish the validity of an arbitration agreement, the "party seeking arbitration bears the burden of establishing that the arbitration agreement binds a nonsignatory." *See Meritage Homes of Tex., LLC v. Pouye*, No. 03-21-00281-CV, 2023 WL 1998889, at *2 (Tex. App.—Austin Feb. 15, 2023, no pet.) (mem. op.) (citing *Santander Consumer USA, Inc. v. Mata*, No. 03-14-00782-CV, 2017 WL 1208767, at *2 (Tex. App.—Austin Mar. 29, 2017, no pet.) (mem. op.)); *see also In re Weekley Homes, L.P.*, 180 S.W.3d at 130 (placing the burden on the moving party to show a valid agreement to arbitrate was binding on a "nonparty").

We apply state law in determining whether a nonsignatory can be bound by an arbitration agreement regardless of whether the agreement is governed by the Federal Arbitration Act (FAA)

---

[6] When an agreement incorporates the AAA rules, this generally establishes a clear and unmistakable agreement to delegate such questions exclusively to the arbitrator. *See Lennar Homes of Tex. Land & Constr., Ltd. v. Whiteley*, No. 21-0783, 2023 WL 3398584, at *5 (Tex. May 12, 2023). However, when, as here, the party resisting arbitration is not a signatory to the arbitration agreement incorporating the AAA rules, it is for the court to decide whether the nonsignatory is bound by the agreement. *Id.* (citing *Jody James Farms, JV v. Altman Group Inc.*, 547 S.W.3d 624, 631-32 (Tex. 2018).

or the Texas Arbitration Act (TAA). *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640 at 643 ; *see also In re Weekley Homes*, 180 S.W.3d at 131 (court applies state law in determining whether a "nonparty" is bound to an arbitration agreement "while endeavoring to keep it as consistent as possible with federal law"); *Todd v. Steamship Mut. Underwriting Ass'n (Bermuda) Ltd.*, 601 F.3d 329, 335 (5th Cir. 2010) (recognizing that the U.S. Supreme Court has made it clear that state law controls whether an arbitration clause can apply to nonsignatories) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009)).

## III. DISCUSSION

### A. The nature of the dispute

The parties agree that the Subcontract was incorporated by reference into the Performance Bond by its express terms.[7] But they disagree on the applicability of the arbitration agreement contained therein.

Trans-Vac argues that because the Subcontract was incorporated by reference into the Performance Bond "without restriction or limitation," the parties intended for all of the provisions in the Subcontract, including the arbitration clause, to apply "whole cloth" to Hudson, thereby binding Hudson to arbitrate any and all disputes it might have with Tran-Vac—even those arising under the Performance Bond. Trans-Vac contends that Hudson cannot parse out the provisions in the Subcontract and selectively decide which portions apply to it and which do not. And Trans-Vac further reasons that by agreeing to act as MGB's surety, Hudson agreed to "stand in the shoes"

---

[7] The Performance Bond states that the "subcontract is by reference made a part hereof. . . . " "[Texas] law has long recognized that the terms of a separate contract may be incorporated by reference into an insurance policy if that reference is clearly manifested in the terms of the policy itself." *ExxonMobil Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 21-0936, 2023 WL 2939596, at *1 (Tex. Apr. 14, 2023). And "when a document is incorporated into another by reference, both instruments must be read and construed together." *See St. David's Healthcare P'ship, LP v. Fuller*, 627 S.W.3d 707, 712 (Tex. App.—Austin 2021, pet. dism'd) (citing *Bob Montgomery Chevrolet, Inc. v. Dent Zone Companies*, 409 S.W.3d 181, 189 (Tex. App.—Dallas 2013, no pet.); *In re C & H News Co.*, 133 S.W.3d 642, 645-46 (Tex. App.—Corpus Christi 2003, orig. proceeding)).

of MGB for virtually all aspects of the parties' relationship, therefore Hudson was bound to all of the same contractual provisions that bound MGB. We disagree for two reasons.

First, we agree with Hudson that the parties' general intent in incorporating the Subcontract into the Performance Bond was to make Hudson aware of MGB's contractual obligations it was undertaking to guarantee. *See AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 242 F.3d 777, 781 (8th Cir. 2001) (recognizing that the incorporation of a construction contract into a performance bond "clarified the performance obligations" of the subcontractor that the surety undertook to guarantee). And Hudson concedes that if Trans-Vac had notified it of MGB's default in a timely manner and if Hudson had undertaken to remedy MGB's default by completing its work, it would have "stepped into" MGB's shoes for that purpose and been bound by all of the same contractual obligations that were imposed on MGB, including the duty to arbitrate disputes arising from Hudson's performance in completing the work. *See Beard Family P'ship v. Commercial Indem. Ins. Co.*, 116 S.W.3d 839, 845 (Tex. App.—Austin 2003, no pet.) (recognizing that a surety "stands in the shoes" of its principal in the event of a default by its principal, and therefore, to the extent the surety undertook to complete the principal's performance, the surety was bound to do so under the same contractual terms to which the principal agreed).

However, Trans-Vac did not give Hudson the opportunity to remedy MGB's default; instead, it remedied the default itself and later sought payment from Hudson for its excess expenses. And, given Hudson's nonsuit of its other affirmative defenses, the only pending dispute between the parties is whether Trans-Vac fulfilled its obligation to make a timely demand for payment under the terms of the Performance Bond.[8] Under these circumstances, Hudson cannot

---

[8] Trans-Vac concedes that Hudson nonsuited its other affirmative defenses to payment, which arguably could be related to MGB's performance under the Subcontract, but Trans-Vac points out that Hudson's nonsuit was without prejudice, and therefore, Hudson could raise those defenses in the future if the court determines that Trans-Vac's claim was not time-barred. While this may be true, we cannot concern ourselves with matters that may or may not occur in the future. Instead, we must resolve the issue before us based solely on the appellate record from the trial court. *See Hogg v. Lynch, Chappell & Alsup, P.C.*, 480 S.W.3d 767, 773 (Tex. App.—El Paso 2015, no pet.) ("With limited

be said to stand in MGB's shoes for the purposes of litigating this particular dispute. *See Dobson Bros. Constr. Co. v. Ratliff, Inc.*, No. 4:08CV3103, 2009 WL 806800, *11 (D. Neb. Feb. 27, 2009) (rejecting the argument that a surety "stands in the shoes" of its principal when the surety never assumes the principal's duties, as a surety bond is not the same as an insurance policy); *Weaver & Tidwell, L.L.P. v. The Guarantee Co. of N. Am. USA*, No. 05-10-00557-CV, 2011 WL 635261, at *3 (Tex. App.—Dallas Feb. 23, 2011, no pet.) (mem. op.) (holding that a surety did not stand "in the same shoes" as its principal—and therefore was not subject to the terms of an arbitration clause in an agreement between the principal and the defendant—where the surety's claim was not based on any of the terms or requirements of the contract containing the arbitration clause and was instead based on an independent tort claim for fraud and breach of fiduciary duty).

Second, because arbitration is a matter of consent, we agree with Hudson that the Subcontract's incorporation by reference into the Performance Bond does not automatically give rise to an inference that it consented to arbitrate disputes relating solely to whether Trans-Vac complied with the Performance Bond terms. *AgGrow Oils*, 242 F.3d at 781 (mindful that arbitration is a matter of consent, not coercion, court was "unwilling to construe an incorporation clause whose obvious purpose was to clarify the extent of the surety's secondary obligation as also reflecting a mutual intent to compel arbitration of all disputes between the surety and the obligee under the bond"). Other courts have distinguished disputes arising from the parties' performance obligations in an underlying construction contract from those arising solely from a violation of the terms of a performance bond. *See, e.g., Id; see also Fid. & Deposit Co. of Maryland v. Parsons & Whittemore Contractors Corp.*, 48 N.Y.2d 127, 131, 397 N.E.2d 380, 382 (1979) (distinguishing

---

exceptions not material here, an appellate court may not consider matters outside the appellate record.") (citing *In re M.S.*, 115 S.W.3d 534, 546 (Tex. 2003) ("this Court—or any appellate court—may only consider the record presented to it")); *see also Quorum Intern. v. Tarrant Appraisal Dist.*, 114 S.W.3d 568, 572 (Tex. App.—Fort Worth 2003, pet. denied) (recognizing that appellate court is "bound to determine [an appeal] on the record as filed").

between disputes arising from the parties' obligations in the underlying construction contract and disputes arising solely under performance bond terms); *Gloucester City Bd. of Educ. v. Am. Arbitration Ass'n*, 333 N.J. Super. 511, 523, 755 A.2d 1256, 1262 (App. Div. 2000) (distinguishing between claims relating to the parties' performance obligations under a construction contract and those involving the surety's personal defenses arising from the bond provisions).

Here, since the only dispute between the parties is Hudson's affirmative defense that Trans-Vac's claim for payment was time-barred by the Performance Bond terms, i.e., a "unique" bond defense, we must examine arbitration agreement itself to determine if the parties intended for that particular dispute to be subject to arbitration. *AgGrow Oils*, 242 F.3d at 781-82 (examining the nature of the parties' agreement to determine if disputes involving a surety's "unique" defenses was subject to arbitration); *see generally Branch Law Firm L.L.P. v. Osborn*, 532 S.W.3d 1, 13 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (recognizing that the question of who is bound by an arbitration agreement is ultimately a function of the parties' intent as expressed within the terms of the agreement itself) (citing *Rubiola*, 334 S.W.3d at 224); *see also Lucchese Boot Co. v. Solano*, 473 S.W.3d 404, 414 (Tex. App.—El Paso 2015, no pet.) (recognizing same).

In other words, we see the issue before us as focusing on the second step in the analysis, i.e., whether the parties intended for their particular dispute to fall within the scope of the arbitration agreement.[9] *See Granite Re Inc. v. Jay Mills Contracting Inc.*, No. 02-14-00357-CV, 2015 WL 1869216, at *4 (Tex. App.—Fort Worth Apr. 23, 2015, no pet.) (mem.op.) (recognizing that even if a valid arbitration clause contained in a construction contract was incorporated by reference into a performance bond, the claims brought between the obligee and the surety still had to fall within the scope of the arbitration clause); *Ideal Mfg., Inc. v. NGC Group, Inc.*, No. 1:19-

---

[9] Our role is not to resolve the merits of this dispute but only to determine whether the dispute falls within the scope of the arbitration agreement, making it proper for the arbitrator to decide, or whether it falls outside the scope, making a court the proper forum in which to resolve the dispute.

CV-164, 2020 WL 826638, at \*4 (S.D. Tex. Feb. 4, 2020), report and recommendation adopted, No. 1:19-CV-00164, 2020 WL 824102 (S.D. Tex. Feb. 19, 2020) (same); *Suretec Ins. Co. v. C.R. Crawford Constr., LLC*, No. 6:21-CV-00398-JDK, 2021 WL 6280376, at \*8 (E.D. Tex. Dec. 15, 2021), report and recommendation adopted, No. 6:21-CV-398-JDK, 2022 WL 45056 (E.D. Tex. Jan. 4, 2022) (having determined that a valid arbitration agreement existed between the parties due to the agreement's incorporation by reference into another contract, the court was then required to determine whether "the dispute in question falls within the scope of that arbitration agreement"); *see generally In re Rubiola*, 334 S.W.3d at 224–26 (even though the parties moving for arbitration were identified as non-signatories authorized to compel arbitration, there remained the question of whether the parties' underlying claims fell within the arbitration agreement's scope).

### B. Discerning the parties' intent

#### (1) *The distinction between general and specific arbitration agreements*

In discerning whether the parties intended for a surety's bond defense to fall within the scope of an arbitration agreement, we agree with Hudson that we must draw a distinction between an agreement that contains "broad" and "general" language indicating that it applies to "any claims arising from or relating to the contract" and an agreement that contains "specific" or "narrow" language demonstrating an intent to only bind the signatories to the agreement. Hudson appears willing to concede that when an arbitration agreement contains broad language and does not name the parties to whom it applies, it can bind a surety to arbitrate any disputes relating to the contract, including those relating to the surety's unique bond defenses.[10]

---

[10] *See, e.g., Suretec Ins. Co. v. C.R. Crawford Constr., LLC*, No. 6:21-CV-00398-JDK, 2021 WL 6280376, at \*8 (E.D. Tex. Dec. 15, 2021) (where construction contract contained a "broad" arbitration agreement subjecting "[a]ny Claim arising out of or related to the Contract" to arbitration, which was incorporated by reference into surety's performance bond, the parties' disputes, which included the surety's defenses under the performance bond and disputes regarding whether the principal under the bond adequately performed its obligations under the construction contract, fell within the scope of the agreement); *Granite Re Inc. v. Jay Mills Contracting Inc.*, No. 02-14-00357-CV, 2015 WL 1869216, at \*4-5 (Tex. App.—Fort Worth Apr. 23, 2015, no pet.) (mem. op) (where "broad" arbitration agreement contained in a construction contract providing that "all claims, disputes and controversies arising out of or relating to [the contract] shall be decided by arbitration" was incorporated by reference into a surety performance bond, dispute between

As Hudson points out, however, numerous courts have held that when an arbitration agreement specifies the parties to whom it applies, e.g., the contractor and subcontractor, a different analysis applies. In that instance, if the dispute between the surety and the contractor does not involve performance issues under the contract, and instead only involves issues relating to the terms of the performance bond, then the dispute does not fall within the scope of the arbitration agreement. *See, e.g., Ideal Mfg*, 2020 WL 826638, at *1 (where arbitration agreement in subcontracts, which were incorporated into a performance bond, referred specifically to disputes between contractor and subcontractor arising under the subcontracts, surety's dispute with contractor arising under the performance bond did not fall within the scope of the agreement).[11]

---

contractor and surety arising under the bond fell within the scope of the agreement) (citing *Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir.1998) ("Broad arbitration clauses [governing disputes relating to the contract] are not limited to claims that literally 'arise under the contract,' but rather embrace all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute.")); *see also Jewish Fed'n of Greater New Orleans v. Fidelity &Deposit Co.*, No. 01-30371, 2001 WL 1085096 (5th Cir. Aug. 29, 2001) (per curiam) (recognizing that arbitration agreement in a construction contract providing "[a]ny controversy or Claim arising out of or related to the Contract, or the breach thereof, shall be settled by arbitration" could bind a surety to litigate its disputes with the contractor where the agreement was incorporated by reference into the surety's performance bond); Thomas H. Hayman et al., *Incorporation By Reference: A Surety's Duty to Arbitrate*, 11 E. Bond Claims Rev. 2 at 7 (2008) (the majority of courts recognize that "arbitration clauses, which do not specifically identify the parties agreeing to arbitration, will be considered broad enough to include the surety.").

[11] Numerous other federal and state courts have recognized the same principle. *See Developers Sur. & Indem. Co. v. Carothers Constr., Inc.*, 320 F. Supp. 3d 386, 392 (D. Conn. 2018) (where arbitration provision incorporated by reference into surety's performance bond specified that it applied to disputes between the contractor and the subcontractor, surety's dispute with the contractor did not fall within the scope of the agreement); *W. Sur. Co. v. U.S. Eng'g Co.*, 211 F. Supp. 3d 302, 308 (D.D.C. 2016) (where arbitration agreement in construction contract incorporated by reference in a performance bond provided that it applied to any controversy or claim involving contractor and subcontractor, claims involving surety's obligations under the performance bond did not fall within the scope of the agreement); *M.A. Mortenson Co. v. Saunders Concrete Co., Inc.*, No. CIV. 11-935 DWF/FLN, 2011 WL 2672248, at *7 (D. Minn. July 8, 2011) (mem.op.), aff'd, 676 F.3d 1153 (8th Cir. 2012) (where arbitration agreement in construction contract incorporated by reference into a performance bond by its express terms only governed disputes between contractor and subcontractor arising under the subcontract, a dispute between the contractor and the surety arising under the bond was beyond the scope of the arbitration agreement); *Schneider Electric Buildings Critical Sys., Inc. v. Western Surety Co.*, 454 Md. 698, 165 A.3d 485, 491-92 (2017) (where an arbitration clause "unambiguously limits its application to disputes between [contractor and subcontractor]," a court should not "alter the language of that promise to include [the surety]"); *Fid. & Deposit Co. of Maryland v. Parsons & Whittemore Contractors Corp.*, 48 N.Y.2d 127, 131, 397 N.E.2d 380, 382 (1979) (although an arbitration agreement in a construction contract incorporated into a performance bond expressed an intent to bind the surety to arbitrate disputes arising under the contract, it did not, standing alone, express an intent to bind the surety to arbitrate disputes arising under the bond); *Gloucester City Bd. of Educ. v. Am. Arbitration Ass'n*, 333 N.J. Super. 511, 523, 755 A.2d 1256, 1262 (App. Div. 2000) (contractor's claim against subcontractor's statutory surety was not subject to arbitration clause contained in construction contract and incorporated into performance bond because contractor's claim did not involve performance of underlying construction contract but involved surety's personal defenses arising from the provisions of the bond itself). Various commentators have also recognized this principle. *See* Chris McRae & Erin Berger, *Arbitration and*

While conceding that other courts have drawn this distinction between general and specific arbitration agreements, Trans-Vac contends that Texas law does not support doing so, pointing out that Hudson did not cite any Texas court cases supporting the distinction. And Trans-Vac contends that we should not adopt the reasoning of these other courts. We note, however, that the distinction between general and specific arbitration agreements has been generally recognized in Texas case law as a factor in determining the agreement's intended scope. *See Greystone Multi-Family Builders, Inc. v. Tes Elec., LP*, No. 01-15-00640-CV, 2016 WL 3362208, at *5 (Tex. pp.— Houston [1st Dist.] June 16, 2016, no pet.) (mem. op.) (recognizing the distinction between broad and narrow arbitration agreements as a factor in determining the agreement's intended scope). In addition, in *Granite Re*, the Fort Worth Court of Appeals found it significant that an arbitration agreement found in a subcontract contained "broad" language providing that it applied to "all claims, disputes and controversies arising out of or relating to [the contract]," in determining that the surety was required to arbitrate its disputes with the contractor. *Granite Re*, 2015 WL 1869216, at *5. As well, in *Rubiola*, the Texas Supreme Court found it significant that an arbitration agreement contained "broad" language defining arbitrable disputes to include "any and all controversies between the parties of whatever type or manner" in determining that a dispute involving non-signatories to the agreement came within scope of the agreement. *Rubiola*, 334 S.W.3d at 224–26; *see also FirstMerit Bank*, 52 S.W.3d at 755 (finding the "broad" language used in an arbitration agreement to be a factor in determining its scope); *Branch Law Firm*, 532 S.W.3d at 20 (recognizing that arbitration agreements containing "broad" language providing for arbitration of all claims arising under a contract evidences the parties' intent to apply the agreement liberally to embrace any dispute having any connection to the contract). Accordingly, we agree

*the Surety: The Good, the Bad, and How It Can Get Ugly, Part II,* 61 No. 11 Dri For The Defense 36, 38 (2019); *see also* Neal J. Sweeney, *Compelling the Surety to Arbitrate — "Not So Fast, My Friend!,"* 38-SUM CONSTR. L. 27, 27 (2018).

with Hudson that it is appropriate under Texas law to consider whether the Subcontract's arbitration agreement contained either "broad" or "specific" language in determining the parties' intent to bind a surety to the terms of the arbitration agreement.

### (2) *The arbitration agreement language was specific to Trans-Vac and MGB*

Trans-Vac argues that even if we were to draw a distinction between broad and specific arbitration agreements, Subcontract's arbitration agreement language was broad enough to support a finding that the parties intended to arbitrate all disputes between them, even those arising under the Performance Bond. We disagree with this argument as well.

The Subcontract contained a series of dispute resolution provisions that culminated in arbitration. Article 10 of the Subcontract, entitled "Claims and Disputes," provides a very detailed claims resolution procedure, beginning with Article 10.6: "Subcontractor hereby agrees that all claims, disputes and other matters arising out of or relating to the Subcontract or the Subcontract Documents . . . shall be resolved through the following dispute resolution procedures."[12] Article 10.6.1 then provides that if the "Contractor and Subcontractor cannot reach resolution on a matter relating to or arising out of the Subcontract or Subcontractor's performance in connection with the Project," the "Parties" must first engage in good faith negotiations. And the Subcontract defines "Parties" as the "Contractor" and the "Subcontractor." If the negotiations are unsuccessful, Articles 10.6.2 and 10.6.3 next require the Parties to engage in mediation under the AAA, with the Parties sharing the mediation fee. If mediation is unsuccessful, Articles 10.6.4 and 10.6.5 provide for arbitration as the final resolution:

> 10.6.4: "For any claims subject to but not resolved by mediation pursuant to Articles 10.6.2 and l0.6.3, the method of binding dispute resolution shall be . . . Arbitration pursuant to Article 10.6.5 of this Subcontract."

---

[12] The Subcontract defined the term "Subcontract Documents" to include the upstream contract and associated documents; the prime contract and associated documents; all modification and change orders; and various documents setting forth the scope of work and the parties' performance obligations. It did not list the Performance Bond among these documents.

10.6.5: "If the Parties have selected arbitration as the method of binding dispute resolution in Article 10.6.4, any claim subject to, but not resolved by, mediation shall be subject to arbitration which, unless the Parties mutually agree otherwise, shall be conducted in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association in [effect] on the date of service of the demand for arbitration (the Arbitration rules)."

In arguing that the Subcontract's dispute resolution provisions are broad in nature, Trans-Vac focuses primarily on only two of those provisions: (1) Article 10.6, which broadly states that the Subcontractor [MGB] is agreeing to the dispute resolution procedures with regard to "all claims, disputes and other matters arising out of or relating to the Subcontract or the Subcontract Documents"; and (2) Article 10.6.4, which also refers to "any claims" not previously resolved by mediation, without identifying the parties to whom the article applies. And Trans-Vac contends that the language referring to "any claims" is similar to the "broad" language used in other arbitration agreements, which various courts have found sufficient to bind a surety. In particular, Trans-Vac relies on the federal district court's opinion in *Western Surety Company* where it held that a construction contract's arbitration agreement, which was incorporated by reference into a surety's performance bond, applied to the surety's bond dispute with the contractor, finding it significant that the agreement was "broadly worded, applying to '[a]ll claims, disputes and other matters in question,' without limitation to particular named parties, and without excluding [the surety] from its application." [13] *See W. Sur. Co.*, 2022 WL 2057725, at *5-6.

---

[13] Trans-Vac finds it significant that the Subcontract herein also did not expressly "exclude" the surety from the arbitration provisions in the Subcontract or in the Performance Bond, as it could have easily done. *See W. Sur. Co. v. Caddell Constr. Co., Inc.*, No. 7:21-CV-153-FL, 2022 WL 2057725, at *7 (E.D.N.C. June 7, 2022) (finding it significant that the subcontract did not expressly exclude the surety from application of an arbitration agreement that was incorporated by reference into the surety's performance bond). As Hudson points out, however, if the parties had wished to require it to participate in arbitration, they could have expressly included the surety as one of the defined "parties" required to participate in the dispute resolution provisions, yet they failed to do so. *See, e.g., Rubiola*, 334 S.W.3d at 224 (arbitration agreement in a contract expressly provided that "certain non-signatories are to be parties to the agreement."). We therefore conclude that the Subcontract's failure to exclude Hudson in the arbitration agreement does not reflect the parties' intent to bind Hudson to the agreement.

19

In contrast to *Western Surety*, however, here the Subcontract's dispute resolution provisions contain several other key clauses that did in fact name particular parties, i.e., the contractor and the subcontractor, and that must be read in context. As set forth above, those clauses provide that the "Subcontractor" and "Contractor," which are defined as the "Parties" in other portions of the Subcontract, are required to participate in both negotiations and mediation before submitting to arbitration if those steps are unsuccessful. And they further provide that when the "*Parties* have selected arbitration," the proceedings shall be governed by the AAA's arbitration rules. Thus, when we view the dispute resolution provisions as a whole, as we must, it becomes clear that—unlike the provisions in *Western Surety*—the provisions in the Subcontract did in fact expressly limit the arbitration agreement to disputes between Trans-Vac and MGB arising under the Subcontract itself. *See generally J.M. Davidson, Inc.*, 128 S.W.3d at 229 (recognizing that we must examine the entire writing when construing a contract and that "[n]o single provision taken alone will be given controlling effect").

Trans-Vac also compares the dispute resolution provisions in the Subcontract with those in *Granite Re*, in which the court found that an arbitration agreement incorporated into a performance bond was binding on the surety. *Granite Re*, 2015 WL 1869216, at *3-4. We find this case distinguishable as well. In *Granite Re*, a contractor and subcontractor had entered into a "blanket" construction contract, and when the subcontractor allegedly defaulted on its obligations, the contractor completed its work. *Id.* at *1. Thereafter, when the surety refused to remit payment on the bond (for reasons that are not clear from the opinion), the contractor filed a breach-of-contract claim against the surety. *Id.* In concluding that the contractor's claim fell within the scope of the arbitration agreement, the court focused on the "broad" language in the arbitration agreement, which provided "all claims, disputes and controversies arising out of or relating to this Blanket Agreement and any Work Orders issued hereunder . . . shall be decided by arbitration."

20

*Id.* at \*4. Although this language is broad, Trans-Vac finds it significant that the arbitration clause in that case also stated that the "claimant" in any such arbitration proceeding "could be" either the "Contractor" or "Subcontractor." *Id.* at \*1. Trans-Vac contends this language transformed the agreement into a specific one between the contractor and subcontractor, thus *Granite Re* stands for the proposition that even an arbitration agreement expressly naming the contractor and the subcontractor as parties to the agreement can be interpreted broadly enough to bind a surety to resolve disputes arising under a performance bond.

In *Granite Re*, however, the court expressly noted that the language in the arbitration clause identifying the contractor and subcontractor as potential *claimants* in an arbitration proceeding did not limit the clause's scope to disputes between the contractor and the subcontractor and instead was simply intended to clarify that either potential "claimant" could bring an arbitration proceeding—without limiting who the claimant could name as a party to the arbitration. *Id.* at \*4, n. 6. Accordingly, the court concluded that the arbitration agreement was broad enough to allow the contractor, as a "claimant," to bring an arbitration proceeding against the surety. *Id.* In contrast, as set forth above, the Subcontract herein contains language that limits the arbitration agreement solely to the contractor and the subcontractor; it does not simply identify who may be a "claimant" in the proceeding.[14]

---

[14] Hudson also points out that the Subcontract expressly states "[t]he Subcontract Documents shall not be construed to create a contractual relationship of any kind between anyone other than Contractor and Subcontractor." Hudson contends, therefore, that "the subcontract plainly cannot impose any contractual duty (to arbitrate) running from Hudson to Trans-Vac." We disagree with such a broad statement, as it is clearly possible for the parties—who have entered into what is essentially a tripartite contractual relationship—to bind the surety to an arbitration provision despite such language in a contract. *See Granite Re Inc. v. Jay Mills Contracting Inc.*, No. 02-14-00357-CV, 2015 WL 1869216, at \*1, 3-4 (Tex. App.—Fort Worth Apr. 23, 2015, no pet.) (mem. op); *see generally Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 418 (Tex. 1995) (recognizing that "suretyship involves a tripartite relationship between a surety, its principal, and the bond obligee, in which the obligation of the surety is intended to supplement an obligation of the principal owed to the bond obligee").

Given the specific language in the Subcontract requiring only Trans-Vac and MGB to engage in the dispute resolution provisions with regard to disputes between them, we conclude that the contract does not reflect the parties' intent to require Hudson to arbitrate its disputes with Trans-Vac arising solely under the Performance Bond.

**(3)** *The language of the performance bond confirms this conclusion*

We also agree with Hudson that the Performance Bond terms confirm that the parties did not intend for Hudson's unique bond defenses to be subject to arbitration. First, Hudson points out that the Performance Bond stated, "Any suit under this bond must be instituted before the expiration of two years from date on which final payment under the subcontract falls due." And in turn, Hudson points out that the term "suit" is typically defined as a court action. *See McGinnes Indus. Maint. Co rp. v. Phoenix Ins. Co.*, 477 S.W.3d 786, 798 (Tex. 2015) (recognizing that the common, ordinary meaning of "suit" is "a proceeding in court"). Hudson also directs our attention to the "rider" attached to the Performance Bond providing that Chapter 2253 of the Texas Government Code applied, and Hudson points out that a dispute regarding a Performance Bond issued under that Chapter for a public work project must be brought in a *court* in the county in which the project was located. *See* TEX. GOV'T CODE ANN. § 2253.077. While we express no opinion on whether those provisions do in fact serve as time-bars to Trans-Vac's claim, we nevertheless find that they do confirm that the parties intended to resolve disputes arising under the bond in court rather than through arbitration. *See AgGrow Oils*, 242 F.3d at 781 (finding it significant that a provision in a performance bond referred to the "judicial resolution of disputes" in determining that the parties did not intend for disputes arising under the bond to be subject to arbitration).

Accordingly, we find no language in either the Subcontract or the Performance Bond that convinces us that the parties intended to submit disputes between Hudson and Trans-Vac arising

22

under the Performance Bond to arbitration. And in the absence of any such language, Hudson cannot be coerced into giving up its right to a judicial resolution of this dispute with Trans-Vac. *See AgGrow Oils*, 242 F.3d at 781 (in the absence of evidence demonstrating the parties intended for a surety to be bound to an arbitration agreement, it could not conclude that the surety had the right to mandate arbitration of its claims under the bond); *see also Liberty Mut. Ins. Co. v. Mandaree Pub. School Dist. #36,* 503 F.3d 709, 711 (8th Cir. 2007) (concluding that contractor could not compel arbitration of surety's claims arising under the terms of the performance bond, where the intent to arbitrate such disputes was not clearly expressed in the parties' contracts). We therefore conclude that the trial court did not err in denying Trans-Vac's motion to compel arbitration.

We overrule Trans-Vac's first and only issue.

## IV.  CONCLUSION

We affirm the trial court's order denying the motion to compel arbitration and remand to the trial court for further proceedings consistent with our opinion.

LISA J. SOTO, Justice

June 23, 2023

Before Rodriguez, C.J., Palafox, J., Soto, J.

23